Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Laura E. Goolsby (SBN 321721)
Laura.Goolsby@capstonelawyers.com
Nathan N. Kiyam (SBN 317677)
Nate.Kiyam@capstonelawyers.com
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile:   (310) 943-0396

Russell D. Paul (*pro hac vice* forthcoming)
rpaul@bm.net
Abigail J. Gertner (*pro hac vice* forthcoming)
agertner@bm.net
Amey J. Park (*pro hac vice* forthcoming)
apark@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AHMAND YOUNG, individually, and on behalf of a class of similarly situated individuals,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>HYUNDAI MOTOR AMERICA., INC., a California corporation, KIA MOTORS AMERICA, INC., a California corporation, HYUNDAI MOTOR COMPANY, a South Korean corporation, and KIA MOTORS CORPORATION, a South Korean corporation,<br><br>　　　　　Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violation of California's Consumers Legal Remedies Act ("CLRA")<br>(2) Violation of California's Unfair Competition Law<br>(3) Breach of Express Warranty under California Law<br>(4) Breach of Implied Warranty under the Song-Beverly Consumer Warranty Act<br>(5) Breach of Implied Warranty under California Law<br>(6) Breach of Express Warranty under the Magnuson-Moss Warranty Act<br>(7)  Breach of Implied Warranty |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

under the Magnuson-Moss
Warranty Act
(8)  Fraudulent
Concealment/Omission
(9)  Unjust Enrichment

**DEMAND FOR JURY TRIAL**

1.    Plaintiff Ahmand Young ("Plaintiff") brings this Complaint individually and on behalf of all persons in the United States who purchased or leased any 2020-present Kia Telluride vehicle or 2020-present Hyundai Palisade vehicle ("Class Vehicles" or "Vehicles").

2.    Defendants Hyundai Motor America, Inc. ("HMA"), Hyundai Motor Company ("HMC") (together with HMA, "Hyundai"), Kia Motors America, Inc. ("KMA"), and Kia Motors Corporation ("KMC") (together with KMA, "Kia," and Kia collectively with Hyundai, "Defendants") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles. Plaintiff alleges as follows:

## INTRODUCTION

3.    This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

4.    Defendants manufactured, marketed, distributed, and/or sold the Class Vehicles without disclosing that the Class Vehicles' headlights were defective.

5.    Specifically, Plaintiff alleges that the headlights are defective in that they are designed, manufactured, and/or installed in a manner that does not seal out moisture and humidity to a sufficient degree and/or contain defective seals which allow moisture and condensation to intrude on the headlight assembly. As a result, the light output from the headlamp assembly is dim and/or becomes progressively dimmer over time; the high beams fail to illuminate entirely (often without warning), the headlights are and/or become improperly aimed and fail to properly illuminate ahead of the vehicle, and the headlights are and/or become extremely fogged and unfocused (the "Headlight Defect" or "Defect"). As further described below, discovery will show that improperly designed, manufactured, and/or installed headlamp assemblies, internal headlamp connections, and headlamp seals and gaskets result in these failures.

6.     The Headlight Defect presents a significant safety hazard. Drivers, including Plaintiff, are unable to see at a distance in front of them, are unable to see in inclement weather and while driving at night, and are unable to see potential road hazards, including people, animals, and objects. The Headlight Defect endangers drivers, pedestrians, and other vehicles because it makes accidents wherein the vehicle strikes a person, animal, or object in the roadway more likely, and sometimes entirely unavoidable, depending on the degradation of light output or level of headlight failure. For this reason, Class members have reported fear of driving their Class Vehicles at night or in inclement weather.

7.     Defendants sold the Class Vehicles with a 6-year/60,000-mile ("Kia Warranty") or 5-year/60,000-mile ("Hyundai Warranty") New Vehicle Limited Warranty ("NVLW") that purports to cover the headlights. However, owners and lessees often have complained that their Headlights fail and require repair or replacement both within and just outside the warranty period and that they are charged for repair even when within the warranty period. This is evidenced through Class Member reports to the National Highway Traffic Safety Administration ("NHTSA"), which demonstrate that Defendants' authorized dealerships are replacing and repairing Headlights both within, and just outside, the applicable express warranty periods and/or are charging Class Members for repairs within the warranty period.

8.     The Headlight Defect is inherent in each Class Vehicle and was present at the time of sale.

9.     Discovery will show that, since 2019, if not earlier, Defendants have been aware the Class Vehicles' Headlights would need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty, that the replacement Headlights installed would be equally as defective as the originals, and that the Headlight would cause the symptoms of the Headlight Defect described above (poor light output from the headlamp assembly;

sudden high beam failure; improper aiming; failed illumination ahead of the vehicle, and fogged or unfocused headlights) yet Defendants continued to equip the Class Vehicles with defective Headlights. Further, Defendants often claim that the warranties they provided with the vehicles do no cover the headlight diagnosis, calibration or replacement, forcing consumers to pay out of pocket. Moreover, Defendants not only refused to disclose the alleged Defect to consumers, they also actively concealed, and continue to conceal, their knowledge concerning the Headlight Defect.

10. Defendants undertook affirmative measures to conceal Headlight failures and other malfunctions through, among other things, Technical Service Bulletins ("TSB") issued to authorized repair facilities only, and not provided to owners or lessees.

11. Defendants had superior and/or exclusive knowledge of material facts regarding the Headlight Defect due to their pre-production testing, design failure mode analysis, aggregate part sales, consumer complaints about the Defect to Defendants' dealers, who are their agents for vehicle repairs, customer complaints made directly to Kia and Hyundai, dealer audits, aggregate warranty information, consumer complaints to and resulting notice from NHTSA, early consumer complaints on websites and internet forums, dealership repair orders, among other internal sources of information about the problem.

12. The Headlight Defect is material because, *inter alia,* it poses a safety concern. As attested by Class Members in complaints to the National Highway Traffic Safety Administration ("NHTSA"), and other online forums, the Headlights can suddenly fail or dim, causing inability to perceive pedestrians, animals, and other road hazards, inability to perceive and respond to safety threats, and greatly increased risk of collision.

13. Defendants' failure to disclose the Headlight Defect has caused Plaintiff and putative class members to lose the use of their Vehicles' Headlights,

the use of their vehicles at night or during inclement weather, and/or incur costly repairs that have conferred an unjust substantial benefit upon Defendants.

14.     Discovery will show that, in an effort to conceal the Headlight Defect, Defendants have instructed dealers to tell consumers their vehicles are "operating normally" or "operating as intended" when they are not, or to give excuses for sub-par performance such as the headlights not being pointed in the correct direction. This is a common practice in the automotive industry. By denying the existence of a defect, manufacturers can play on the consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty. When remedial measures are taken, they are often through the issuance of service bulletins provided to dealers only that are narrowly crafted and underinclusive, as occurred here and set forth below.

15.     Had Defendants disclosed the Headlight Defect, Plaintiff and Class Members would not have purchased the Class Vehicles, would have paid less for them, or would have required Defendants to replace, or pay for the replacement of, the defective Headlights with a non-defective version before their warranty periods expired.

**THE PARTIES**

**Plaintiff Ahmand Young**

16.     Plaintiff is a California citizen residing in Santa Ana, California

17.     In or around December 28, 2021, Plaintiff purchased a new 2022 Kia Telluride from Kia of Carson, an authorized Kia dealership in Carson, California.

18.     Plaintiff purchased his vehicle primarily for personal, family, or household use.

19.     Passenger safety and reliability were important factors in Plaintiff's decision to purchase his vehicle. Before making his purchase, Plaintiff researched the 2022 Kia Telluride online, by "Googling" the vehicle. At the dealership, Plaintiff also reviewed the vehicle's Monroney Sticker or "window sticker," which

listed official information about the vehicle. Plaintiff also discussed the features of the vehicle with dealership personnel, who made no reference to the Headlight Defect. Plaintiff believed that the 2022 Kia Telluride would be a safe and reliable vehicle.

20.     Defendants' omissions were material to Plaintiff. Had the Kia Defendants disclosed their knowledge of the Headlight Defect before he purchased his vehicle, Plaintiff would have seen and been aware of the disclosures. Furthermore, had he known of the Headlight Defect, Plaintiff would not have purchased his vehicle.

21.     Shortly after purchase, Plaintiff began experiencing difficulties with his Class Vehicle's Headlights. Specifically, the Headlights do not produce sufficient light, and therefore provide an insufficient field of vision. Mr. Young feels particularly unsafe due to the Headlights' insufficient illumination when driving after dark and in dimly lit areas. He sometimes drives with high beams to compensate for the low visibility because of the Headlight Defect, but even the high beams do not produce sufficient light. Such failures have caused Plaintiff to reduce his use of the vehicle during the night and during inclement weather. Plaintiff is in fear of, and in danger from, unilluminated pedestrians, animals, and road hazards while driving at night.

22.     In or about April 2023, Plaintiff brought his vehicle to an authorized Kia dealership in California complaining of insufficient light output, but at no time did the dealership address his concerns or agree to repair the issue.

23.     Despite bringing his vehicle to a Kia dealership— Kia's authorized agent for repairs—Plaintiff has not received a permanent repair under warranty, and his vehicle continues to exhibit the Headlight Defect.

24.     As a result of the Headlight Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, particularly at night and in inclement weather.

1  Further, Plaintiff will be unable to rely on the Class Vehicles' advertising or
2  labeling in the future, and so will not purchase or lease another Class Vehicle,
3  although he would like to do so.

4      25.    At all times, Plaintiff, like all Class Members, has driven his vehicle
5  in a manner both foreseeable and in which it was intended to be used.

6  **Defendant Hyundai Motor America, Inc.**

7      26.    Defendant Hyundai Motor America, Inc. is a corporation organized
8  and in existence under the laws of the State of California and registered to do
9  business in the State of California. HMA is headquartered in Fountain Valley,
10  California and is a wholly owned subsidiary of HMC.

11     27.    HMA is responsible for sales, marketing, service, distribution, import
12  and export of Hyundai branded products, including vehicles and parts, in the
13  United States. HMA is also the warrantor and distributor of Hyundai vehicles,
14  including the Class Vehicles, throughout the United States.

15     28.    In order to sell vehicles to the general public, HMA enters into
16  agreements with authorized dealerships who engage in retail sales with consumers
17  such as Plaintiff. In return for the exclusive right to sell new Hyundai branded
18  vehicles, authorized dealerships are also permitted to service and repair these
19  vehicles under the warranties HMA provides directly to consumers who purchased
20  new vehicles from the authorized dealerships. All service and repair at an
21  authorized dealership is completed according to Hyundai instructions, issued
22  through service manuals, TSBs, and other documents. Per the agreements between
23  HMA and the authorized dealers, consumers such Plaintiff are able to receive
24  services under HMA's issued warranty at dealer locations that are convenient to
25  them. These agreements provide HMA with a significant amount of control over
26  the actions of the authorized dealerships. For example, HMA employees are
27  appointed as managers for particular regions of the United States and their
28  responsibilities include managing the day-to-day operations of the dealerships

located within their regions.[1]

29.　Discovery will show that HMA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Hyundai Class Vehicles.

**Defendant Hyundai Motor Company**

30.　Defendant Hyundai Motor Company is a corporation founded in 1967 under the laws of South Korea and headquartered in Seoul, South Korea.

31.　HMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Hyundai-branded vehicles and parts for those vehicles worldwide, including the United States, as well as manufactures parts for Kia-branded vehicles. HMC also receives parts manufactured by KMC for use in Hyundai-branded vehicles.

32.　HMC is the parent corporation of HMA, as well as the United States based Hyundai facilities, including manufacturing in Alabama and the technical campus in Michigan. For all its United States subsidiaries, including HMA, HMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles

33.　Discovery will show the decision to found HMA in California and register it as a California corporation was made by HMC.

65.　Discovery will show that the relationship between HMA and HMC is governed by an agreement that gives HMC the right to control nearly every aspect of HMA's operations—including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms. Furthermore, HMC exercises control over the executives in charge of HMA, including appointing the President and CEO of HMA, José Muñoz. In

---

[1] *See, e.g.*, https://www.hyundainews.com/en-us/releases/2135 ("Hyundai Motor America named Kimberly Walker General Manager of the Western Region, effective March 1, 2016. In her new role, Walker will lead the day-to-day operations of more than 165 Hyundai dealerships across the 12 Western-most states in the United States.").

addition to this role, Mr. Muñoz is also the Global Chief Operating Office of HMC.[2]

**Defendant Kia Motors America, Inc.**

34.     Defendant Kia Motors America, Inc. is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. KMA is headquartered in Irvine, California and is a wholly owned subsidiary of KMC.

35.     KMA is responsible for sales, marketing, service, distribution, import and export of Kia branded products, including vehicles and parts, in the United States. KMA is also the warrantor and distributor of Kia vehicles, including the Class Vehicles, throughout the United States.

36.     In order to sell vehicles to the general public, KMA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiff. In return for the exclusive right to sell new Kia branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties KMA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to Kia instructions, issued through service manuals, TSBs and other documents. Per the agreements between KMA and the authorized dealers, consumers such as Plaintiff are able to receive services under KMA's issued warranty at dealer locations that are convenient to them. These agreements provide KMA with a significant amount of control over the actions of the authorized dealerships. As with HMA, KMA also employs region managers whose responsibilities include managing the dealers within their region, including marketing and customer satisfaction initiatives.

37.     Discovery will show that KMA also developed and disseminated the

---

[2] *See* https://www.hyundainews.com/en-us/bios/jose-munoz (last accessed November 10, 2022).

owner's manual and warranty booklets, advertisements, and other promotional material relating to the Kia Class Vehicles.

**Defendant Kia Motor Company**

38.     Defendant Kia Motor Company is a corporation founded in 1944 under the laws of South Korea and headquartered in Seoul, South Korea.

39.     KMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Kia-branded vehicles and parts for those vehicles worldwide, including the United States. One of KMC's major suppliers for parts is HMC. In turn, KMC is also a major supplier to HMC of parts to be used Hyundai-branded vehicles.

40.     KMC is the parent corporation of KMA, as well as the United States based Kia facilities, including manufacturing in Georgia. For all its United States subsidiaries, including KMA, KMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles.

41.     Discovery will show that the decision to found KMA in California and register it as a California corporation was made by KMC.

42.     Discovery will show that the relationship between KMA and KMC is governed by an agreement that gives KMC the right to control nearly every aspect of KMA's operations—including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms.

43.     Defendants, through their various entities, design, manufacture, market, distribute, service, repair, sell, and lease passenger vehicles, including the Class Vehicles, nationwide and in Minnesota and South Carolina.

44.     Defendants HMC and KMC worked together to develop, design, manufacture, test, and draft technical materials for the Class Vehicles and the Gamma engines. In fact, HMC and KMC are controlled by the same parent, Hyundai Motor Group, and the chairman of the board of both companies is Eui-

1    sun Chung.

2        45.    Defendants worked together on the drafting and distribution of all

3    advertising materials and technical bulletins regarding the Class Vehicles to

4    authorized dealers, as well as in training Hyundai and Kia-dealer technicians in

5    the correct procedures to maintain, service, and repair Hyundai and Kia vehicles.

6        46.    At all relevant times, Defendants were and are engaged in the

7    business of designing, manufacturing, constructing, assembling, marketing,

8    distributing, and selling automobiles and motor vehicle components in Minnesota,

9    South Carolina, and throughout the United States of America.

10                                **JURISDICTION**

11        47.    This is a class action.

12        48.    Members of the proposed Class number more than 100 and at least

13    one plaintiff and one defendant are citizens of different states.

14        49.    There are at least 100 members in the proposed class, and the

15    aggregate claims of individual Class Members exceed $5,000,000.00 in value,

16    exclusive of interest and costs.

17        50.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

18        51.    This Court has personal jurisdiction over Plaintiff because Plaintiff

19    submits to this Court's jurisdiction. This Court has personal jurisdiction over

20    Defendants because KMA and HMA are incorporated in this District; KMC and

21    HMC conduct substantial business in this District through KMA and HMA,

22    respectively; and discovery will show that significant conduct involving

23    Defendants giving rise to the Complaint took place in this District.

24                                   **VENUE**

25        52.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because

26    the conduct giving rise to this lawsuit occurred here, KMA and HMA are deemed

27    to reside in this district pursuant to 28 U.S.C. § 1391(a), and KMA and HMA are

28    incorporated here, and Defendants are subject to personal jurisdiction here by

conducting business within the State of California. Plaintiff's counsel's Declaration of Venue, to the extent required under California Civil Code section 1780(d), is attached hereto.

## FACTUAL ALLEGATIONS

53.     Defendants designed, manufactured, distributed, marketed, sold, and/or leased the Class Vehicles. Defendants sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in California and nationwide. Defendants warrant and service the Class Vehicles through their nationwide network of authorized dealers and service providers.

54.     Defendants provided all purchasers or lessees of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW"). The terms of these warranties are non-negotiable and Defendants exercise sole authority in determining whether and to what extent a particular repair is covered under the warranties they offers.

55.     The NVLW provided by KMA includes basic warranty coverage and Power Train coverage, stated in relevant part:

**Basic Warranty Coverage**

Except as limited or excluded below, all components of your new Kia Vehicle are covered for 60 months/60,000 miles from the Date of First Service, whichever comes first (Basic Limited Warranty Coverage). This Warranty does not cover wear and maintenance items, or those items excluded elsewhere in the Manual.

**Power Train Coverage**

For Original Owners (defined below), the Power Train Limited Warranty begins upon expiration of the 60 month/60,000 mile Basic Limited Warranty Coverage, and will continue to cover the following components up to 120 months or 100,000 miles from the Date of First Service, whichever comes first. It does not cover normal wear and tear, maintenance, or those items excluded elsewhere in this manual.

1

**To Get Warranty Service**

2

You must take your Kia Vehicle, along with this manual, to an

3

Authorized Kia Dealer in the United States during its normal service

4

hours. While any Authorized Kia Dealer will perform warranty

5

service, Kia recommends that when possible you return to the

6

dealership where you purchased your Kia Vehicle in order to ensure

7

continuity in service and maintenance.

8

**Other Terms**

9

The warranty coverage is "applicable to Kia Vehicles registered and

10

normally operated in the United States."[3]

11

56.     KMA further warrants that "it will arrange for an Authorized Kia

12

dealer at locations of its choice to provide for the repair of your vehicle if it fails

13

to function properly during normal use. Authorized service facilities will remedy

14

such failures to function properly at Kia's expense..."[4]

15

57.     HMA provides a similar NVLW for the Class Vehicles, which states

16

in relevant part:

17

**WHAT IS COVERED**

18

Repair or replacement of any component originally manufactured or

19

installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai

20

Motor Manufacturing Alabama (HMMA), Kia Manufacturing Mexico

21

(KMM), Kia Motors Manufacturing Georgia (KMMG) or Hyundai Motor

22

America (HMA) that is found to be defective in material or workmanship

23

under normal use and maintenance, expect any item specifically referred to

24

in the section "What is not Covered." Towing expense to the nearest

25

Hyundai Dealership or Authorized Service Facility is covered when the

26

vehicle is inoperable due to a warrantable defect. Repairs will be made using

27

---

[3] *Id.*

28

[4] *Id.*

new Hyundai Genuine Parts or Hyundai authorized remanufactured parts.

**WARRANTY PERIOD**

The warranty period is limited to 5 years from the date or original retail delivery or date of first use, or 60,000 miles, whichever occurs first.

**OBTAINING WARRANTY SERVICE**

Warranty service will be provided by an authorized Hyundai Dealership without charge for parts or labor. This warranty will not apply to warranty service performed by those other than an authorized Hyundai Dealership.[5]

58.    Headlights are important and necessary safety equipment on all motor vehicles. "Vehicle headlamps primarily satisfy two safety needs: Visibility and glare prevention. Headlamps illuminate the area ahead of the vehicle and provide forward visibility. . . . Visibility and glare are both related to motor vehicle safety. . . . Visibility has an obvious, intuitive relation to safety: The better drivers can see the road, the better they can react to road conditions and obstacles to avoid crashes. . . . [e]vidence suggests that diminished visibility likely increases the risk of crashes, particularly crashes at higher speeds involving pedestrians, animals, trains, and parked cars."[6]

59.    In 2019, Kia released its all-new flagship SUV, the 2020 Kia Telluride, while touting its capabilities and safety: "Telluride is engineered to be capable in a variety of driving conditions and provide a driving experience that is enjoyable and confidence-inspiring."[7] All Kia Telluride models LS, X, and EX,

---

[5]
https://www.hyundaiusa.com/content/dam/hyundai/us/com/pdf/assurance/2020_Owners_Hand book_Warranty_r2.pdf

[6] Federal Register. "Federal Motor Vehicle Safety Standards; Lamps, Reflective Devices, and Associated Equipment, Adaptive Driving Beam Headlamps" February 2, 2022, available at: https://www.federalregister.gov/documents/2022/02/22/2022-02451/federal-motor-vehicle-safety-standards-lamps-reflective-devices-and-associated-equipment-adaptive#citation-3-p9918 (last accessed March 26, 2024).

[7] "All-New 2020 Kia Telluride Offers Rugged Luxury," January 4, 2019, available at: https://www.kiamedia.com/us/en/media/pressreleases/14874/all-new-2020-kia-telluride-offers-rugged-luxury (last accessed March 26,2024).

through present, come standardly quipped with halogen headlights. Kia Telluride LX models come standardly equipped with LED headlights. For reference, Figure 1 shows the Kia Telluride's headlight assembly.



The following table appears to the right of the figure:

| Part Code | Part Description |
|---|---|
| 92102A | Lamp Assy-Head, RH |
| 92197A | Bracket-H/Lamp MTG Supt, LH |
| 92198 | Bracket-H/Lamp MTG Supt, RH |
| 92197B | Bracket-H/Lamp MTG Supt, LH |
| 98681D | Tube-Rubber |
| 92101A | Lamp Assy-Head, LH |
| 92125A | Moisture Absorbent |
| 18643D | Bulb |
| 92190G | L.E.D Driver Module-Headlamp |
| 1125GA | Bolt(W/Washer) |
| 92198D | Bracket-H/Lamp MTG Supt, RH |

**Fig. 1. Kia Telluride Headlight Assembly**

60. Also in 2019, Hyundai released its all-new flagship SUV, the 2020 Hyundai Palisade, while touting its capabilities and safety: "All-New 2020 Hyundai Palisade Flagship SUV Brings Exceptional Comfort, Technology and Safety in a Bold Midsize SUV."[8]  As with Kia, all Hyundai Palisade models SE and SEL, through present, come standardly equipped with halogen headlights. Hyundai Palisade Limited models come standardly equipped with LED headlights. For reference, Figure 2 shows the Hyundai Palisade's headlight assembly.

---

[8] "All-New 2020 Hyundai Palisade Mid-size SUV Makes its Global Debut at the 2018 Los Angeles Auto Show," November 28, 2018, available at https://www.hyundainews.com/en-us/releases/2658 (last accessed March 26, 2024).

CLASS ACTION COMPLAINT

1

2

3



| Part Code | Part Description |
| --- | --- |
| **92102A** | **Lamp Assy-Head, RH** |
| 92170J | Bracket-Head Lamp, LH |
| 92131 | Bracket Assy-Head Lamp Mtg, LH |
| 92128C | Cartridge-Moisture Absorbent |
| 92191D | Clip-Head Lamp Mtg |
| 92125B | Moisture Absorbent |
| 92208 | Lamp Assy-Day Running Light, RH |
| 92207 | Lamp Assy-Day Running Light, LH |
| 1125GA | Bolt(W/Washer) |
| 92198 | Bracket-H/Lamp Mtg Suport, RH |
| 92197A | Bracket-H/Lamp Mtg Suport, LH |

**Fig. 2. Hyundai Palisade Headlight Assembly**

61.    All headlights and headlight assemblies are expected to absorb some moisture and still operate safely. However, discovery will show that the Headlights installed in the Class Vehicles have insufficient sealing and improper wiring, causing the Headlight Assemblies, including the high beams, low beams, daytime running lights (DRL), and fog lamps (FL), to absorb too much moisture and begin to dim, become improperly aimed, and ultimately and often suddenly, fail.

62.    The Class Vehicles Headlights are defective because they are designed, manufactured, and/or installed in a manner that does not seal out moisture and humidity to a sufficient degree, which causes the Headlight assemblies' internal components, including the wiring and wiring connections, to fail, thereby causing a drastic reduction in light output, an unintentional change to aim calibration, and an inability to operate or function at all. Figure 3 shows a Class Vehicle headlight with improper water moisture and humidity intrusion that will require replacement.

1
2
3
4
5
6
7
8
9

**Fig. 3. Class Vehicle Headlight Assembly with Improper Moisture Intrusion**

63.     The wiring and wiring connections are housed inside the headlight assembly and are vulnerable to improper moisture and humidity intrusion, which can cause the wiring and wiring connections to quickly degrade, thereby causing the Headlights, including the low beams, to not operate. For reference, Figures 4.1 through 4.3 show the location of the wiring and connections inside the headlight assembly of the Class Vehicles.



**Fig. 4.1. Class Vehicle Headlight Assembly**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Fig. 4.2. Inside of Headlight Assembly with Circular Seal in Upper Right Corner**



**Fig. 4.3. Wiring and Headlight Connections Inside Circular Seal within Headlight Assembly**

CLASS ACTION COMPLAINT

64.    The aim of the Class Vehicle's Headlights is also controlled by internal components of the Headlight assembly. Discovery will show that the aiming components are also degraded by abnormal moisture and humidity intrusion, causing the Headlights' output to be mis-aimed and mis-directed, resulting in a failure to illuminate in front of the vehicle. For reference, Figure 5 shows the low beam and high beam aim adjusters' location inside the Class Vehicles' headlight assembly.



**Fig. 5. Low and High-Beam Aim Adjusters Inside Class Vehicle Headlight Assembly**

65.    Discovery will show that all Class Vehicles' Headlights and Headlight Assemblies are designed, manufactured, and installed by Defendants in substantially the same manner.

66.    Discovery will confirm that the Headlight Defect in all Class Vehicles is caused by improperly designed, manufactured, and/or installed headlight assemblies in the Class Vehicles.

67.    The Headlight Defect alleged is inherent in, and the same for, all Class Vehicles.

68.    Discovery will show that Defendants was aware of material facts regarding the Headlight Defect, particular as a result of pre-production testing, manufacturing quality control audits, and the early post-sale complaints by

consumers who purchased the Class Vehicles and experienced the Defect. Despite this knowledge, Defendants failed to disclose the Defect and its associated safety risk to consumers. As a result of this failure, Plaintiff and Class Members have been damaged.

**The Headlight Defect Poses an Unreasonable Safety Hazard**

69.    The Headlight Defect poses an unreasonable safety hazard. The Defect causes drivers to have low or no visibility in the front of their Class Vehicles, which in turn increases the likelihood of collision with pedestrians, animals, inanimate objects, and road hazards.[9] For this reason, functioning headlights are required safety devices in all passenger automobiles. *See* 49 CFR § 238.443 (2018).

70.    Federal law requires automakers like Defendants to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

71.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id.* Discovery will show that HMA and KMA are the agents of HMC and KMC respectively for the purpose of monitoring the NHTSA complaint database and for communication

---

[9] *See* Federal Register. "Federal Motor Vehicle Safety Standards; Lamps, Reflective Devices, and Associated Equipment, Adaptive Driving Beam Headlamps" February 2, 2022, available at: https://www.federalregister.gov/documents/2022/02/22/2022-02451/federal-motor-vehicle-safety-standards-lamps-reflective-devices-and-associated-equipment-adaptive#citation-3-p9918 (last accessed March 26,2024).

with NHTSA regarding safety defects, as manufacturers are required to do by federal law. Thus, Defendants knew or should have known of the many complaints about the Headlight Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Defendants to the Headlight Defect.

72.     With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Headlight Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that Defendants, through their network of dealers and repair technicians, have been made aware of the Headlight Defect. In addition, the complaints indicate that despite having knowledge of the Headlight Defect and even armed with knowledge of the exact vehicles affected, Defendants often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty.

### **2020 Kia Telluride**

a.  **DATE OF INCIDENT:** September 14, 2019
**DATE COMPLAINT FILED:** September 16, 2019
**NHTSA/ODI ID:** 11255716
**SUMMARY:** THE HEADLIGHTS AT NIGHT ARE POOR. THEY DO NOT ILLUMINATE TRAFFIC SIGNS SUCH AS: SPEED LIMIT, STOP, STREET/HIGHWAY INFO, YIELD, WARNING, ETC. WHEN YOU APPROACH A THE UPSIDE OF A HILL, VISIBILITY IS LIMITED TO 30-50 FEET. SIDE VISION WHEN TURNING IS NON-EXISTENT. THIS OCCURS AT NIGHT WHEN IN MOTION AND STOPPED.

b.  **DATE OF INCIDENT:** November 10, 2019
**DATE COMPLAINT FILED:** November 14, 2019
**NHTSA/ODI ID:** 11280024
**SUMMARY:** THE TELLURIDE EX HAS AN ISSUE WITH IT'S HEADLIGHTS, ESPECIALLY IN A DIMLY LIT AREA. WHEN THE HEADLIGHTS ARE IN NORMAL MODE (NOT HIGH BEAM) ON A STREET THAT DOES NOT HAVE STREETLIGHTS

(NO AMBIENT LIGHTS) OR YOU ARE GOING AROUND A TURN, OR YOU ARE GOING SLIGHTLY UPHILL, THERE IS VERY LITTLE VISIBILITY ON THE ROAD. YOU CAN SEE A DISTINCT CUT OFF OF THE HEAD LIGHT AND YOU CANNOT SEE BEYOND IT. THIS MAKES IT VERY VERY DIFFICULT TO DRIVE IN A LOW LIGHT ENVIRONMENT. IF I AM ON A HIGHWAY OR A WELL LIT ROAD, THERE IS NO ISSUE. MY OTHER CAR 2010 AUDI A4 DOES NOT HAVE THIS ISSUE AND THE HEADLIGHTS ILLUMINATE THE ROAD ADEQUATELY IN ANY CONDITION

c. **DATE OF INCIDENT:** November 19, 2019
**DATE COMPLAINT FILED:**    November 20, 2019
**NHTSA/ODI ID:**    11281250
**SUMMARY:** HALOGEN HEADLAMPS ON THE EX MODEL DO A POOR JOB OF ILLUMINATING THE ROAD AHEAD WHEN IN LOW BEAM MODE. I CAN HARDLY SEE A FEW FEET. I ALSO DRIVE A LEXUS WHOSE HEADLAMPS DO A FANTASTIC JOB OF ILLUMINATION IN LOW BEAM. I AM HAVING TO PERIODICALLY ALTERNATE BETWEEN HIGH BEAM AND LOW BEAM MODES (TO AVOID BLINDING OPPOSITE TRAFFIC) WHEN DRIVING THE TELLURIDE ON UNLIT ROADS OR POORLY LIT ROADS. WHY DIDN'T KIA PROVIDE LED HEADLIGHTS FOR ALL TRIM LEVELS? THIS IS A SERIOUS SAFETY ISSUE.

d. **DATE OF INCIDENT:** August 3, 2019
**DATE COMPLAINT FILED:** November 21, 2019
**NHTSA/ODI ID:** 11281548
**SUMMARY:** THIS IS A NEW VEHICLE, PURCHASED 8/2019. IT IS MY BELIEF THAT THE HEADLIGHTS (BOTH HIGH AND LOW BEAM), AS EQUIPPED, ARE DANGEROUSLY DEFICIENT AND DO NOT PROVIDE NEARLY ADEQUATE ILLUMINATION. I AM HESITANT TO DRIVE THE VEHICLE AT NIGHT. I CONSIDER THIS HAZARDOUS AND WORTHY OF CORRECTION BY THE MANUFACTURER. KIA TELLURIDE EX AWD.

e. **DATE OF INCIDENT:** October 1, 2019
**DATE COMPLAINT FILED:** December 29, 2019
**NHTSA/ODI ID:** 11291891
**SUMMARY:** I HAVE A 2020 TELLURIDE AND THE

HEADLIGHTS PROVIDE SO LITTLE LIGHT THAT IT'S DANGEROUS TO DRIVE AT NIGHT. THE NORMAL BEAMS ARE SO DIFFUSE THEY PROVIDE INSUFFICIENT LIGHT FORWARD TO SEE THE ROAD CLEARLY AND PROVIDE NO LIGHT TO THE SIDES, SO YOU CAN'T SEE WHAT YOU ARE TURNING INTO WHEN YOU TURN. I CALLED KIA AND TWO LOCAL KIA DEALERS; THEY ARE AWARE OF THE PROBLEM BUT SAY THEY HAVE NO WAY TO FIX IT. GOOD HEADLIGHTS ARE FUNDAMENTAL AND, REALLY, AFTER 100 YEARS OF CARS WITH HEADLIGHTS, YOU'D THINK THEY COULD GET THIS RIGHT. PLEASE FORCE KIA TO RECALL THE CARS AND FIX THE HEADLIGHTS AS SOON AS POSSIBLE. THANK YOU. SANDRA THANK YOU. SANDRA

f.  **DATE OF INCIDENT:** November 26, 2019
**DATE COMPLAINT FILED:** January 24, 2020
**NHTSA/ODI ID:** 11301584
**SUMMARY:** THIS IS AN ONGOING ISSUE. THE HEADLIGHTS ON MY EX MODEL ARE SERIOUSLY DEFICIENT AND DANGEROUS, ESPECIALLY DURING DRIVING IN LOW LIGHT AREA DURING TURNS. AT MY OWN EXPENSE I'VE PURCHASED LED BULBS, WHICH HAVE IMPROVED VISIBILITY AHEAD OF ME, INCLUDING BEING, NOW, ABLE TO SEE THE SIDES OF THE ROAD, HOWEVER, VISIBILITY DURING TURNS IS NON-EXISTENT. AFTER 30 + YEARS OF DRIVING I HAVE NEVER BEEN SO UNCOMFORTABLE DRIVING AT NIGHT.

g.  **DATE OF INCIDENT:** January 26, 2020
**DATE COMPLAINT FILED:** January 27, 2020
**NHTSA/ODI ID:** 11302348
**SUMMARY:** THE HEADLIGHTS ON THIS CAR ARE DANGEROUS AT NIGHT ON STREETS WITH NO LIGHTING AND ESPECIALLY DANGEROUS WHEN ITS RAINING. THE LIGHTS DO NO ILLUMINATE SPEED LIMIT SIGNS, STOP SIGNS, CAUTION SIGNS, YIELD SIGNS ETC. THEY DO NOT ILLUMINATE OVERHEAD INTERSTATE SIGNS. I HAVE TAKEN THE CAR TO THE DEALER AND THEY SAID THE LIGHTS ARE WORKING AS DESIGNED. THE INSURANCE INSTITUTE FOR HIGHWAY SAFETY ALSO GIVES A POOR RATING TO THESE LIGHTS. SOMETHING NEEDS TO BE DONE BEFORE SOMEONE GETS KILLED.

h.  **DATE OF INCIDENT:** January 24, 2020
**DATE COMPLAINT FILED:** January 27, 2020
**NHTSA/ODI ID:** 11302241
**SUMMARY:** HEADLIGHTS ON LX TRIM ARE EXTREMELY
DIM. INSUFFICIENT FOR NIGHT DRIVING, CURVY/HILLY
ROADS, RAINY CONDITIONS. LANE MARKERS ARE NEARLY
IMPOSSIBLE TO SEE.

i.  **DATE OF INCIDENT:** January 10, 2020
**DATE COMPLAINT FILED:** February 5, 2020
**NHTSA/ODI ID:** 11307230
**SUMMARY:** HALOGEN BULBS IN HEADLIGHTS ON S TRIM
ARE SUBOPTIMAL FOR ROADWAY ILLUMINATION DURING
NIGHTTIME    DRIVING    REGARDLESS    OF    TERRAIN,
ENVIRONMENT, OR DIRECRION. UPGRADE TO LED BULBS
SHOULD RESULT IN IMPROVED VISIBILITY.

j.  **DATE OF INCIDENT:** April 26, 2019
**DATE COMPLAINT FILED:** February 4, 2020
**NHTSA/ODI ID:** 11306967
**SUMMARY:**    THE    HEADLIGHTS    ON    THIS    CAR    ARE
DANGEROUS    AT    NIGHT    AND    ARE    ESPECIALLY
DANGEROUS  WHEN  IT'S  RAINING.  THE  LIGHTS  DO  NO
ILLUMINATE SPEED LIMIT SIGNS, STOP SIGNS, CAUTION
SIGNS,  YIELD  SIGNS  ETC...  THE  HEADLIGHTS  DO  NOT
ILLUMINATE  FAR  ENOUGH  AHEAD  ON  THE  ROADS.  IF
YOUR GOING UP OR DOWN A HILL TO SEE A SAFE DRIVING
DISTANCE AHEAD.

k.  **DATE OF INCIDENT:** November 30, 2019
**DATE COMPLAINT FILED:** February 4, 2020
**NHTSA/ODI ID:** 11306971
**SUMMARY:** THE HEADLIGHTS ON MY EX MODEL ARE
SERIOUSLY  DEFICIENT  AND  DANGEROUS,  ESPECIALLY
DURING DRIVING IN LOW LIGHT AREA DURING TURNS. AT
MY OWN EXPENSE I'VE PURCHASED LED BULBS, WHICH
HAVE  IMPROVED  VISIBILITY  AHEAD  OF  ME.  HOWEVER,
THE  LIGHT  IS  BLOCKED  BY  THE  PROJECTOR  TYPE
HOUSING  FROM  ILLUMINATING  THE  LEFT  AND  RIGHT
SIDES OF THE FRONT OF THE VEHICLE. VISIBILITY DURING
TURNS IS NON-EXISTENT. THIS NEEDS TO BE ADDRESSED

ASAP.

l.  **DATE OF INCIDENT:** February 3, 2020
**DATE COMPLAINT FILED:** February 4, 2020
**NHTSA/ODI ID:** 11307078
**SUMMARY:** EXTERIOR LIGHTING (HEADLIGHTS) IS
TERRIBLE ON MY EX MODEL. STANDARD OE HEADLIGHTS
ARE FAR TOO INADEQUATE FOR SAFE DRIVING AT NIGHT.
SIDE CUTOFF OF THE HEADLIGHTS MAKES READING
STREET SIGNS DIFFICULT WHEN THERE IS NO
SUPPLEMENTAL LIGHT OUTSIDE OF THE CAR
HEADLIGHTS. THESE HEADLIGHTS SHOULD BE LED (IT?S
2020 FOR [XXX] SAKE) AND NOT SO CONCENTRATED LIKE
A SPOT LIGHT. INFORMATION REDACTED PURSUANT TO
THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
552(B)(6). *TR.

m. **DATE OF INCIDENT:** February 2, 2020
**DATE COMPLAINT FILED:** February 2, 2020
**NHTSA/ODI ID:** 11306611
**SUMMARY:** WHEN DRIVING AT NIGHT IN THE EX TRIM,
THE HALOGEN LIGHTBULBS ARE INEFFECTIVE FOR
LIGHTING THE ROADWAY AHEAD. OUTSIDE OF CITY
DRIVING WHERE OUTSIDE LIGHTING IS MINIMAL, IT IS
NEARLY IMPOSSIBLE TO SEE A SAFE DISTANCE AHEAD OF
THE VEHICLE. IN ADDITION, BECAUSE OF THE CUTOFF
DESIGN OF THE PROJECTOR HOUSING, STREET SIGNS SUCH
AS STOP SIGNS AND SPEED LIMIT SIGNS ARE BARELY
ILLUMINATED AT ALL.

n.  **DATE OF INCIDENT:** May 14, 2020
**DATE COMPLAINT FILED:** May 19, 2020
**NHTSA/ODI ID:** 11325091
**SUMMARY:** THE HEADLIGHTS IN THE KIA TELLURIDE ARE
SIGNIFICANTLY DEFICIENT IN ILLUMINATING THE FRONT
CORNERS OF THE VEHICLE DURING TURNS IN LOW OR
NON-LIT AREAS. DRIVING IN MY NEIGHBORHOOD AND ON
THE ROADS THAT GET ME THERE FEELS EXTREMELY
DANGEROUS WHILE DRIVING AT NIGHT. VISIBILITY WHEN
TURNING CORNERS IS DANGEROUSLY LOW. THIS SCARES
ME NOT ONLY AS A TELLURIDE OWNER BUT AS A
PEDESTRIAN AND A PARENT WITH TWO SMALL CHILDREN.

1
2
3
4
5
6
7
8
9
10
11
12

AS THE TELLURIDE'S POPULARITY CONTINUES TO GROW SO DOES THE SAFETY HAZARD THESE POORLY DESIGNED HEADLIGHTS POSE. CORRECTIVE ACTION TO ADEQUATELY AND SAFELY ILLUMINATE THE ROAD WHILE MAKING TURNS IS ESSENTIAL AND NEEDS TO BE ADDRESSED IMMEDIATELY. PLEASE DO THE RESPONSIBLE THING AND PROTECT FAMILIES AND COMMUNITIES BY RECALLING THE TELLURIDE AND MAKE A SIMPLE DESIGN CHANGE THAT WOULD NOT ONLY IMPROVE OWNER SATISFACTION, BUT ALSO PROTECT A POTENTIALLY UNSEEN PEDESTRIAN, JOGGER, BICYCLIST OR PET. A VEHICLE'S SAFETY SHOULD BE PARAMOUNT BOTH DAY AND NIGHT. IF NOTHING ELSE, PLEASE PROVIDE THE OPTION FOR TELLURIDE OWNERS TO WIDEN THE HEADLIGHT BEAM AT OUR OWN EXPENSE SO WE CAN CHOOSE TO PROTECT OURSELVES AND OUR NEIGHBORS BY PAYING FOR IT OUT-OF-POCKET. *TR.

13
14
15
16
17
18
19

o.  **DATE OF INCIDENT:** March 1, 2020
**DATE COMPLAINT FILED:** March 3, 2020
**NHTSA/ODI ID:** 11315912
**SUMMARY:** NIGHT DRIVING IS HORRIBLE ON THE EX TRIM WHERE VISIBILITY ON EITHER SIDE IS DANGEROUS. I ALMOST HIT A PEDESTRIAN BECAUSE THE VISIBILITY IS SO POOR. THIS NEEDS TO BE ADDRESSED. PLEASE DON'T WAIT FOR SOMEONE TO BE FATALLY INJURED. THIS IS UNACCEPTABLE!

20
21
22
23
24
25
26

p.  **DATE OF INCIDENT:** February 29, 2020
**DATE COMPLAINT FILED:** March 2, 2020
**NHTSA/ODI ID:** 11315718
**SUMMARY:** LIGHTING FAILS TO ILLUMINATE TO THE SIDES OF THE VEHICLE ON THE EX TRIM SO THAT THERE ARE SPOTS OF NO LIGHTING. THIS IS EXTREMELY DANGEROUS WHEN DRIVING AT NIGHT AND PARTICULARLY WHEN TURNING CORNERS. THIS SHOULD BE REMEDIED AND A RECALL ISSUED TO CORRECT THE CONCERN AS IT IS A SERIOUS SAFETY HAZARD.

27
28

q.  **DATE OF INCIDENT:** March 1, 2020
**DATE COMPLAINT FILED:** February 26, 2020
**NHTSA/ODI ID:** 11311596

**SUMMARY:** BLIND SPOT COLLISION WARNING SYSTEM IS MALFUNCTIONS WHENEVER IT RAINS. VEHICLE HAS 3000 MILES ON IT AND FOR THE 5TH TIME IN 2 MONTHS THE BLIND SPOT SYSTEM ALARM SYSTEM GOES OFF WHILE DRIVING IN THE RAIN. DEALERSHIPS REFUSING TO LOOK AT THE PROBLEM UNLESS THE ENGINE LIGHT IS ON, WHICH IT TURNS OFF ONCE THE SENSORS DRY OFF LOW BEAM LIGHTS ARE TOO BRIGHT... POLICE HAVE STOPPED ME TWICE THINKING THEY ARE HIGH BEAMS.. ALSO ONCOMING TRAFFIC CONTINUES TO BLAST THERE HIGH BEAMS AT OUR VEHICLE THINKING OUR HIGH BEAMS ARE ON CAUSING A DANGEROUS DRIVING SITUATION.. LOCAL DEALERSHIPS REFUSE TO FIX WARRANTY PROBLEMS BECAUSE CAR WAS NOT PURCHSAED FROM THEM

r. **DATE OF INCIDENT:** February 15, 2020
**DATE COMPLAINT FILED:** February 17, 2020
**NHTSA/ODI ID:** 11309673
**SUMMARY:** THE HEADLIGHTS HAVE BLIND SPOTS ON THE SIDES. WHEN GOING AROUND CURVES YOU LOOSE THE SIDE OF THE ROAD. NO VISIBILITY AT ALL AT NIGHT. THIS IS VERY DANGEROUS. I HAVE TALKED TO COMPANYS THAT INSTALLS HEADLIGHTS AND OTHER MECHANICAL PARTS TO VEHICLES AND WAS TOLD THAT ADDING FOG LIGHTS WILL NOT HELP BECAUSE THE HEADLIGHTS ARE ONLY PROJECTING FORWARD LIGHTS. WAS TOLD THAT ADDING FOG LIGHTS WOULD ONLY PROJECT FORWARD ALSO BECAUSE OF THE WAY THEY WOULD HAVE TO SET. THIS NEEDS TO BE CORRECTED!!!

**2021 Kia Telluride**

s. **DATE OF INCIDENT:** January 3, 2022
**DATE COMPLAINT FILED:** January 11, 2022
**NHTSA/ODI ID:** 11447121
**SUMMARY:** Optional LED headlight buckets fog up and will not dry out. Kia has a service bulletin out regarding this issue, it was performed and the situation has not improved. Recently, in minus 20-30 degree F weather, the condensation inside the housing frosted up the entire inside of the housing. The LED headlights do not generate enough heat to adequately melt the frost creating decreased headlight performance. The vehicle has been into the dealer multiple times and

the service bulletin was performed once and the desiccant packs were replaced the second time. The frost issue occurred after both had been done. Kia states that this is normal operation for their LED headlight bucket and the dealership, claiming to be under orders from Kia will not dedicate any more time to the investigation of my issue.

t. **DATE OF INCIDENT:** December 8, 2020
**DATE COMPLAINT FILED:** December 8, 2021
**NHTSA/ODI ID:** 11443178
**SUMMARY:** Kia has been on notice of the Telluride's deficient headlights with the ES model since at least 2019 and have done nothing. The highest end model has LED lights so Kia is more than capable of fixing this problem. I know that dozens of consumers like myself have filed complaints with the NHTSA and other organizations and nothing has been done. I have called Kia headquarters at least 3 times to complain. The headlights do not provide enough light to safely drive at night. I'm not an engineer (I'm a lawyer) but I know that the design is faulty. Now that it's wintertime and dark at 5:00, I am unable to drive the car at night for fear of killing myself, my family, a pedestrian, or pet. Why hasn't NHTSA done anything to investigate these numerous complaints? Why have years gone on with resolution or recall? Is Kia (or the NHSTA) waiting for someone to actually die before they do something? (It seems so based on the below questions). I guess it's not enough that consumers like myself can't use our cars at night. I CAN'T BE ANY CLEARER: SOMEONE IS GOING TO GET KILLED. YOU ARE ON NOTICE. Please let me know the results of your investigation into this matter because this has gone on long enough. Conduct an investigation and get to the bottom on this please.

u. **DATE OF INCIDENT:** July 1, 2021
**DATE COMPLAINT FILED:** July 20, 2021
**NHTSA/ODI ID:** 11425646
**SUMMARY:** This car is very dangerous to drive at night particularly when making turns. There is a total blackout when turning on darker roads. Obviously test drives are done during the day so you wouldn't notice this problem. After reviewing a Telluride Forum this was apparently a problem on the 2020 vehicles that has not been addressed by Kia. Some members of forum have suggested switching front headlights out to LED but that is not a good option as I live in an area where visibility can be made worse with LED when snowing. Had I been aware of this problem never would have purchased this car. Very scary to drive at night.

v. **DATE OF INCIDENT:** October 15, 2020
**DATE COMPLAINT FILED:** November 19, 2020
**NHTSA/ODI ID:** 11315912
**SUMMARY:** I RECENTLY DROVE MY NEW 2021 TELLURIDE SX TO MY CABIN IN GA. AND FOUND A MAJOR ISSUE WITH THE HEADLIGHTS WHILE DRIVING THROUGH THE BACKWOODS. THE VISIBILITY USING THE LED HEADLIGHTS AND HIGH BEAMS ARE TERRIBLE AND POSE A DANGER. IF YOU ARE DRIVING DOWNHILL AND THE ROAD GOES UP OR TURNS YOU HAVE ZERO VISIBILITY, IT ACTUALLY CREATES A LINE AS IN MY PICTURE. I BROUGHT IT INTO MY KIA DEALER AND THEY SAID CORPORATE IS AWARE OF IT BUT THERE IS NO FIX AS OF YET SO THEY ADJUSTED THEM AS BEST THEY COULD. THIS IS EXTREMELY DANGEROUS AND PEOPLE WILL DIE IF THEY DO NOT GET A A FIX FOR THIS ISSUE.

**2022 Kia Telluride**

w. **DATE OF INCIDENT:** May 20, 2022
**DATE COMPLAINT FILED:** November 2, 2022
**NHTSA/ODI ID:** 11491918
**SUMMARY:** Headlights are NOT bright enough for night driving.

**2021 Hyundai Palisade**

x. **DATE OF INCIDENT:** July 13, 2020
**DATE COMPLAINT FILED:** August 2, 2022
**NHTSA/ODI ID:** 11477157
**SUMMARY:** Head lights -When driving in mountains (curves and going up and down hills) at night the head lights produced a shadow effect, which gave the impression it was on the windshield sight line. This shadow effect varied from 1/3 to 2/3 of the windshield which caused a distorted view of the road ahead. There were 4 adults in the car and all agreed that it was making the road dangerous to drive on. We had to slow down well below the actual speed limit which would cause cars coming around a curve behind us to quickly slow down or run into us. - Took car to Bronco Motors in Boise Id and explained the headlight issue they told us that one other person had come in complaining about this same issue. Their mechanic told us that there is no way to adjust the headlights. -No warnings

Page 28

y. **DATE OF INCIDENT:** December 22, 2021
**DATE COMPLAINT FILED:** March 2, 2021
**NHTSA/ODI ID:** 11444720
**SUMMARY:** The low beam headlights are too bright causing vehicles in the opposite direction to flash their high beams thinking that my high beams are on. This is a safety factor as I am often blinded by other drivers who flash their high beams and in many cases keep their high beams on. I've visited Palisade chat rooms and have found that other drivers have the same complaint. I have contacted Hyundai headquarters and reported the problem and have taken it to dealers three times to have the low beams lowered. I have been told that the low beam adjustment is correct and nothing can be done to fix my problem. I believe this low beam problem is a design defect and should be corrected. My vehicle is available for examination if necessary.

### Customer Complaints on Third-Party Websites

73.     Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Defendants' awareness of the problems with the Headlight and how potentially dangerous the defect is for consumers, not only to the extent such complaints reference contact with authorized dealerships and Defendants themselves, but also because HMA and KMA employ staff to monitor the perception of the brand. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

74.     On tellurideforum.org, a consumer of a 2021 Kia Telluride posted the following:

> I have had my Telluride S 2021 since August and I am very frustrated with the headlights at night. #1 I don't think the main headlights beam high enough. When I go up a hill I must have my brights on to adequately see in front of me. #2 I noticed a complete blind spot when turning...At night if someone walked

1    in front of my car while I am turning I could never see them.
2    This is quite scary to me. Thought perhaps it is because I am
3    short but now I am reading that this is a common complaint with
4    this car. Now I read that the "fog lights" can help illuminate the
5    car when turning. Of course now I found out I don't have fog
6    lights in this car style. I hate to say this but if I had any inkling
7    of this problem would never have bought this car. It is very
8    dangerous.

9    75.    On tellurideforum.org.com, a consumer of a 2020 Kia Telluride
10   posted the following:

11   Hi. My telluride is less than a year old. I noticed the other night
12   that when I switch to high beams nothing changes. Low beams
13   work like they always have. Are they separate bulbs? Is this a
14   warranty issue? How hard is it to upgrade the lights. The
15   original sucks. It's a LX if that matters.

16   76.    On tellurideforum.org.com, a consumer of a 2020 Kia Telluride
17   posted the following:

18   We just got a Telluride EX a couple of weeks ago. We hadn't
19   driven it at night on dark roads until last night. It was dangerous
20   in our opinion. The light had a definite line that almost appeared
21   like a dark screen on the windshield. Upon stopping and looking
22   at the headlamps, I discovered that there is some kind of black
23   deflector on the bottom and top of the headlamp bulb. This
24   creates a "border" at the top of the light being shone on the road
25   and surroundings. Normal headlamps allow some light to shine
26   above this artificial border. I find this current lighting
27   dangerous.

28   77.    On tellurideforum.org.com, a consumer of a 2020 Kia Telluride

CLASS ACTION COMPLAINT

consumer posted the following:

> High beam headlights on Kia Telluride stopped working, plus when on low beam light projection is only about 20 yards. Safety issue. Suggest contacting NHSTA for this issue. Kia dealership cannot schedule appointment for a month.

78. On carproblemzoo.com, a 2020 Kia Telluride consumer posted the following:

> High beams will not function. Replaced light bulbs. Did not fix the problm. Replaced relay and fuse. Did not fix the problem. Took to dealer. Service tech appeared to be befuddled. His only suggestion was to replace both headlight assemblies at a cost of over $2000. 00 or just wait until kia announced a recall as he could not determine exact cause of problem.

79. On carproblemzoo.com, another consumer posted the following:

> I love this car. I replaced my 2016 Lexus gl 460 with the 2020 Telluride ex v6, a low milage previously owned car I found at a dealership because I felt it compared favorably in every way with the Lexus, which I had bought new. Unfortunately, like others who have complained about the same lighting issue, I did not do a night time test drive of this car, but when I did finally drive it at night - wow! the headlights on this vehicle are the absolute worst I have ever experienced as a driver. My first experience driving this kia after dark on a city street proved to be dangerous and scary. Lighting was so poor- especially the peripheral lighting and low beam height range - that I could not find my destination because the house numbers on the mailboxes as well as the street sign were not lit well enough to read. But what was worse is that I very nearly hit a pedestrian

who was walking on the side of the road. By the way, my vision is 20/20 and night driving has not preiously been a problem. I knew there had to be something wrong with the lighting system so the next day I took the car straight to the dealer who checked the bulbs and their placement; he found no problem. I am a widow so I drive myself everywhere I go, including at night. Bright, safe illumination is a must! I am not driving much at night these days because I feel it is way too risky considering the poor visibility after dark. I can tell you that kia will have a law suit (or multiple suits) on their hands when this poor headlight situation is the cause of a serious accident!

80.   On carproblemzoo.com, a 2021 Kia Telluride consumer posted the following:

I recently drove my new 2021 Telluride sx to my cabin in GA. And found a major issue with the headlights while driving through the backwoods. The visibility using the led headlights and high beams are terrible and pose a danger. If you are driving downhill and the road goes up or turns you have zero visibility, it actually creates a line as in my picture. I brought it into my kia dealer and they said corporate is aware of it but there is no fix as of yet so they adjusted them as best they could. This is extremely dangerous and people will die if they do not get a a fix for this issue.

81.   On carproblemzoo.com, a Hyundai Palisade consumer posted the following:

head lights -when driving in mountains (curves and going up and down hills) at night the head lights produced a shadow effect, which gave the impression it was on the windshield sight

line. This shadow effect varied from 1/3 to 2/3 of the windshield which caused a distorted view of the road ahead. There were 4 adults in the car and all agreed that it was making the road dangerous to drive on. We had to slow down well below the actual speed limit which would cause cars coming around a curve behind us to quickly slow down or run into us. - took car to bronco motors in boise id and explained the headlight issue they told us that one other person had come in complaining about this same issue. Their mechanic told us that there is no way to adjust the headlights.

82.    On carproblemzoo.com, a Hyundai Palisade consumer posted the following:

The low beam headlights are too bright causing vehicles in the opposite direction to flash their high beams thinking that my high beams are on. This is a safety factor as I am often blinded by other drivers who flash their high beams and in many cases keep their high beams on. I've visited Palisade chat rooms and have found that other drivers have the same complaint. I have contacted Hyundai headquarters and reported the problem and have taken it to dealers three times to have the low beams lowered. I have been told that the low beam adjustment is correct and nothing can be done to fix my problem. I believe this low beam problem is a design defect and should be corrected. My vehicle is available for examination if necessary.

83.    On palisadeforums.org, a 2021 Hyundai Palisade consumer posted the following:

The headlights on the 2021 Palisade are very dangerous at night! You have a black blob on the road at all times and can

1    not see in the oncoming lane!

2    Very Dangerous and a law suit waiting to happen. Sad Hyundai

3    knows about this issue and has not changed their lighting!

4    **Defendants Had Superior and Exclusive Knowledge of the Headlight Defect**

5    84.    Defendants had superior and exclusive knowledge of the Headlight

6    Defect and knew or should have known that the defect was not known or

7    reasonably discoverable by Plaintiff and Class Members before they purchased or

8    leased the Class Vehicles.

9    85.    Discovery will show that before Plaintiff purchased his Class Vehicle,

10   and since at least 2019, Defendants knew about the Headlight Defect through

11   sources not available to consumers, including pre-release testing data, early

12   consumer complaints to Defendants and its dealers who are their agents for vehicle

13   repairs, consumer complaints regarding earlier model years equipped with the

14   same Headlight, testing conducted in response to those complaints, high failure

15   rates and replacement part sales data, consumer complaints to NHTSA (which

16   Defendants monitors), by developing TSBs in an effort to address the Headlight

17   Defect, and through other aggregate data from Defendants dealers about the

18   problem. TSBs are issued exclusively to Defendants' dealerships and service

19   providers and are not disseminated to consumers, even if their vehicles receive

20   services as outlined in the bulletins.

21   86.    Defendants are experienced in the design and manufacture of

22   consumer vehicles. As an experienced manufacturer, Defendants conducts tests,

23   including pre-sale durability testing, on incoming components, including the

24   Headlight and Headlight Assembly, to verify the parts are free from defect and

25   align with Defendants' specifications. Thus, Defendants knew or should have

26   known the Headlight was defective and prone to putting drivers in a dangerous

27   position due to the inherent risks of the Headlight Defect.

28   87.    Additionally, discovery will show that Defendants knew of the impact

of this defect from the sheer number of reports received from dealerships. Defendants' customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the defect, which led to the release of TSBs and dealer communications. Defendants' customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

88.     Defendants' warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Defendants' policy that when a repair is made under warranty the dealership must provide Defendants with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

89.     Well before the first Class Vehicle was sold, as early as March 2010, Defendants knew or should have known that the Headlights were defective in design and/or manufacture and that the Defect would adversely affect the drivability of the Class Vehicles and cause safety hazards, including collisions. Defendants first began using Headlight Assembly components that were vulnerable to improper moisture and humidity intrusion in its 2010 model year vehicles.[10]

90.     Indeed, beginning in March 2010, Kia first issued TSB No. BOD055 for all Kia models, ostensibly providing "Information for Headlamp Condensation and Moisture." The TSB advises that "Headlamp assembly replacement WILL NOT be necessary in most cases." However, it directs authorized dealership

---

[10] "Headlight Condensation TSB," March 12, 2010, available at: https://www.kia-forums.com/threads/headlight-condensation-tsb.57749/ (last accessed November 14, 2022).

personnel to replace the headlamp assembly where there is improper "water intrusion."

91.    In January 2019, Kia began "a Product Improvement Campaign to adjust the headlamp aim" for certain Class Vehicles. This product improvement campaign was conducted "to more precisely focus the headlamps on the correct position on the roadway and reduce the glare from the headlamps to oncoming traffic." The communication to "All Kia Dealer Principals" regarding the product improvement campaign states "The Insurance Institute for Highway Safety (IIHS) is a well-known organization that conducts supplemental testing to evaluate certain aspects of vehicle performance. As a result of such testing, Kia and IIHS have determined that improvements could be made to adjust the headlamp aim to improve the focus and reduce glare from the headlamps to oncoming traffic." The campaign was updated in January 2020. Discovery will show that the problem persists despite this product improvement campaign and is a result of the Defect as described herein.

92.    In April 2019, Kia issued a service action, TSB No. SA380, for "Telluride Headlamp Inspection." The service action was issued to address "intermittent or inoperative Daytime Running Lamp (DRL) at the headlamps due to an internal connection fault." The service action describes the headlight inspection procedure and states "Leave the DRLs on for twenty minutes. If one or both DRL(s) is/are not operating as designed, proceed to the Headlamp Replacement Procedure below." Discovery will show that the problem persists despite headlight and headlight assembly replacement and is a result of the Defect as described herein.

93.    In June 2021, Kia issued TSB No. ELE242, regarding "Headlamp Soft Connection Inspection." The service action was issued to address "inoperative/intermittently inoperative. . . low/sub-low beam on Telluride." The service action describes the headlight inspection procedure and states "If headlamp

does NOT operate normally (low beam or sub-low beam), replace the headlamp with a new part." Discovery will show that the problem persists despite headlight and headlight assembly replacement and is a result of the Defect as described herein.

94.     In September 2021, Kia issued a significantly revised TSB No. BOD055 (Rev 1) for certain Class Vehicles. The TSB was still titled "Information for Headlamp Condensation and Moisture." Specifically, the TSB was issued to correct "failed headlamp assembly seals or gaskets," resulting in excessive "water intrusion." The TSB directs dealership personnel to "locate the area of failure and determine if it is repairable. In some cases, headlamp replacement will be necessary." Discovery will show that the problem persists despite headlight and headlight assembly replacement and is a result of the Defect as described herein.

95.     Similarly, in July 2017, Hyundai first issued a TSB for all Hyundai models, ostensibly providing "Information for Lamp Condensation." TSB No. 17-BD-01 provided "information regarding headlamp and rear combination lamp condensation related to moisture accumulation in the lens assembly." The TSB advises that, if moisture remains inside the headlight assembly after the directed drying procedures, "further repairs need to be performed on the lamp to address the condition."

96.     In July 2019, Hyundai superseded TSB No. 17-BD-01 with TSB No. 19-BD-003H for certain Class Vehicles. The TSB was titled "Information for Headlamp and Rear Combination Lamp Condensation." Specifically, the TSB was issued to correct headlight problems caused by "water leak[s]." The TSB stated that, "If water is collecting at the bottom of the headlamp assembly or the condensation remains after the headlamps have been on for 30 minutes or more, there may be a water leak in the assembly. The leak may be caused by a poor seal between the headlamp housing and lens, cracks in the headlamp assembly, or poor fitment. The condition should be diagnosed and repaired as necessary." The only

repair procedure prescribed by the TSB for this condition was "replacement of the head lamp assembly." Discovery will show that the problem persisted despite the advised repairs and TSB No. 20-BD-014H, issued in July 2020 for certain Class Vehicles, updated this TSB with additional service information, and is a result of the Defect as described herein.

97.   Discovery will show that each TSB, product improvement campaign, and service action issued by Defendants was approved by managers, directors, and/or executives at Kia and Hyundai. Therefore, discovery will show that Defendants' managers, directors, and/or executives knew, or should have known, about the Headlight Defect, but refused to disclose the Headlight Defect to prospective purchasers and owners, and/or actively concealed the Headlight Defect.

98.   The existence of the Headlight Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiff and other Class Members known of the Headlight Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

99.   Reasonable consumers, like Plaintiff, expect that a vehicle's Headlights are safe, will function in a manner that will not pose a safety risk and will illuminate the area in front of the vehicle adequately, and are free from defects. Plaintiff and Class Members further reasonably expect that Defendants will not sell or lease vehicles with known safety defects, such as the Headlight Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Defendants to conceal and fail to disclose the Headlight Defect to them, and to then continually deny its existence.

**Defendants Have Actively Concealed the Headlight Defect**

100.  Despite their knowledge of the Headlight Defect in the Class Vehicles, Defendants actively concealed the existence and nature of the defect

from Plaintiff and Class Members. Specifically, Defendants failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)     any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the Headlights;

(b)     that the Class Vehicles, including the Headlight, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)     that the Class Vehicles and their Headlights were defective, despite the fact that Defendants learned of such defects as early as 2019, if not earlier.

101.  Discovery will show that when consumers present their Class Vehicles to an authorized Defendants' dealer for Headlight repairs, rather than repair the problem under warranty, Defendants' dealers either inform consumers that their vehicles are functioning properly or conduct repairs that merely mask the Headlight Defect such as attempting to reposition the lights even when the headlights are dim rather than out of position. This includes Kia's Product Improvement Campaign in 2019, which attempted to deflect from the root causes of the Defect, namely defective seals which allow moisture and condensation to intrude on the headlight assembly causing dim and failed headlights.

102.  Defendants have caused Plaintiff and Class Members to expend money and/or time at their dealerships to diagnose, repair or replace the Class Vehicles' Headlights and/or related components, despite Defendants' knowledge of the Headlight Defect.

**Defendants Have Unjustly Retained a Substantial Benefit**

103.   Discovery will show that Defendants unlawfully failed to disclose the alleged defect to induce Plaintiff and other putative Class Members to purchase or lease the Class Vehicles.

104.  Plaintiff further alleges that Defendants thus engaged in deceptive

acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiff.

105.   As discussed above, therefore, Plaintiff alleges that Defendants unlawfully induced his to purchase his Class Vehicle by concealing a material fact (the defective Headlight) and that he would have paid less for the Class Vehicle, or not purchased it at all, had he known of the defect.

106.   Accordingly, Defendants' ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did - and likely will continue to - deceive consumers, should be disgorged.

### The Agency Relationship regarding the Vehicle Warranties Between Defendants HMA and KMA and their Authorized Dealers

107.   In order to sell vehicles to the general public, Defendants HMA and KMA enter into agreements with their networks of authorized dealerships to engage in retail sales with consumers such as Plaintiff while also advertising the warranties provided by HMA and KMA directly to consumers when they purchase a Kia or Hyundai-branded vehicle from the authorized dealership. These agreements specifically authorize the dealerships to act in HMA and KMA's stead to provide repairs under the warranties HMA and KMA provide directly to consumers. Accordingly, discovery will show, particularly the dealership agreements between Defendant HMA and KMA and third-party dealerships, that Defendants HMA and KMA have authorized these dealerships to be their agents for the purposes of warranty repairs, including diagnosis of whether warranty repairs are required, and as such, the consumers are third-party beneficiaries of these dealership agreements because they benefit from being able to purchase and receive warranty repairs locally. Discovery will show that because Plaintiff and members of the Class are third-party beneficiaries of the dealership agreement which create an implied warranty of merchantability of the goods being sold by

1   these authorized dealerships, they may avail themselves of the implied warranty
2   against Defendants. This is true because third-party beneficiaries to contracts
3   between other parties that create an implied warranty of merchantability may avail
4   themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended*
5   *Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145,
6   1185 (C.D. Cal. 2010).

7   108.   Further, Plaintiff and each of the members of the Class are the
8   intended beneficiaries of the express and implied warranties which accompany
9   each Class Vehicle. The dealers were not intended to be the ultimate consumers of
10   the Class Vehicles, and they have no rights under the warranty agreements provided
11   by HMA or KMA. These warranties were designed for and intended to benefit the
12   consumers only. The consumers are the true intended beneficiaries of the express
13   and implied warranties, and the consumers may therefore avail themselves of those
14   warranties.

15   109.   HMA and KMA issued the express warranty to Plaintiff and the Class
16   members. HMA and KMA also developed and disseminated the owner's manuals
17   and warranty booklets which direct consumers to take their vehicles to authorized
18   dealerships for diagnosis and repair. HMA and KMA also developed and
19   disseminated the advertisements such as vehicle brochures and television
20   commercials, and other promotional materials relating to the Class Vehicles and
21   promoting the terms of the warranties that they issue with the sale of each Class
22   Vehicle. HMA and KMA are also responsible for the content of the Monroney
23   Stickers on their vehicles. Because they issue the express warranties directly to the
24   consumers, the consumers are in direct privity with HMA and KMA with respect
25   to the warranties.

26   110.   In promoting, selling, and repairing their defective vehicles,
27   Defendants act through numerous authorized dealers who act as, and represent
28   themselves to the public as exclusive Kia and Hyundai representatives and agents,

1   particularly for the purpose of providing repairs that are the responsibility of HMA
2   and KMA to provide under their respective warranties. That the dealers act as
3   Defendants' agents for this purpose is demonstrated by the following facts:

4           (a)    The authorized dealerships complete all service and repair
5   according to instructions disseminated directly to them by HMA and/or
6   KMA, including service manuals, technical service bulletins ("TSBs"),
7   technical tips ("TT"), and other documents drafted by HMC and/or KMC;

8           (b)    Technicians at Defendants dealerships are required to go to at
9   least yearly KMA and HMA-given trainings in order to remain certified to
10  work on Kia and Hyundai-branded vehicles, at which they receive training
11  on proprietary systems, which provides guided, step-by-step instructions on
12  diagnosing and repairing Kia and Hyundai-branded vehicles;

13          (c)    Consumers are able to receive services under Kia and
14  Hyundai's issued New Vehicle Limited Warranties only at authorized
15  dealerships, and they are able to receive these services because of the
16  agreements between HMA and KMA and the authorized dealers. These
17  agreements provide HMA and/or KMA with a significant amount of control
18  over the actions of the authorized dealerships;

19          (d)    The warranties provided by HMA and/or KMA for the
20  defective vehicles direct consumers to take their vehicles to authorized
21  dealerships for repairs or services;    (e)    HMA and KMA control the
22  way in which their authorized dealers can respond to complaints and
23  inquiries concerning defective vehicles, and the dealerships are able to
24  perform repairs under warranty only with HMA or KMA's authorization;

25          (f)    HMA and KMA have entered into agreements and
26  understandings with their authorized dealers pursuant to which they
27  authorize and exercise substantial control over the operations of their
28  dealers and the dealers' interaction with the public, particularly the

CLASS ACTION COMPLAINT

advertising of the Class Vehicles, specifically the terms and conditions of the express warranties, as well as how consumers may avail themselves of the remedies under those express warranties; and

(g) HMA and KMA implemented their express and implied warranties as they relate to the defects alleged herein by instructing authorized Kia and Hyundai dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

111. Indeed, HMA's and KMA's warranty booklets make it abundantly clear that only their authorized dealerships are their agents for warranty service. The booklets, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, "You must take your Kia Vehicle, along with this manual, to an Authorized Kia Dealer in the United States during its normal service hours.," (Kia Warranty); and "[w]arranty service will be provided by an authorized Hyundai Dealership without charge for parts or labor." (Hyundai Warranty).

112. Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendants for the purposes of the warranties, which are direct contracts between HMA, KMA, and the purchasers of their branded vehicles. Plaintiff and each of the members of the Class have had sufficient direct dealings with either HMA, KMA, or their agent dealerships to establish privity of contract between HMA or KMA, on one hand, and Plaintiff and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiff and Defendants. It also establishes that Plaintiff was dealing with Defendants through their authorized agent dealerships when they were given the New Vehicle Limited Warranty associated with their vehicles, without any ability to negotiate the terms of that Warranty.

## Defendants' Warranties were Unconscionable

113. Plaintiff signed a contract for sale with Defendants' authorized

dealers, and with that sale, was presented with a separate Warranty as drafted by KMA and/or HMA. While Plaintiff has some ability to negotiate price of the vehicle, he has no ability to negotiate the terms of the Warranty. Plaintiff had no bargaining power with respect to the Warranty, was presented with it as a *fait accompli*, and had to accept it in the exact form in which it was presented to him, which occurred after the vehicle purchase transaction was completed. Plaintiff had no meaningful choice regarding any aspect of the Warranty or its terms, including durational limitations of time and mileage. The terms of the warranty unreasonably favored HMA or KMA over Plaintiff and the members of the Class; a gross disparity in bargaining power existed as between HMA and KMA and Class members; and HMA and KMA knew or should have known that the Headlight Defect would manifest in the Class Vehicles both before and after the Warranty, thereby rendering the time and mileage limitations insufficient, inadequate, and unconscionable.

114.   HMA and KMA drafted the terms of the Warranty in part by using their exclusive, superior knowledge of the existence and likely manifestation of the Defect. Plaintiff and Class Members were entirely ignorant of the Defect when purchasing their Vehicles and when presented with the Warranty. Plaintiff's acceptance of the Warranty and its terms, including any disclaimers or durational limits, was neither knowing nor voluntary. HMA and KMA knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely solely because of a defect in design, materials, and workmanship, to wit, the Headlight Defect. Plaintiff and Class Members, on the other hand, had no notice of or ability to detect the Defect prior to purchasing the Class Vehicles. For this reason, the terms of the Warranty unreasonably favored HMA and KMA over Plaintiff and Class Members, and Plaintiff's and Class Members' acceptance of the Warranty's durational limitations, to the extent they are found to apply so as to exclude instances where the Defect manifested outside of them, was neither

1  knowing nor voluntary, thereby rendering such limitation unconscionable and

2  ineffective.

3       115.   Defendants' exclusive superior knowledge of the existence of the

4  Defect and when it would manifest influenced its analysis of the Defect and

5  whether it should pay for a recall (*i.e.,* if a defect is more likely to manifest within

6  the durational limits, a recall is only fractionally more expensive than warranty

7  repairs; if it is more likely to manifest outside those limits, a recall is exponentially

8  more expensive than warranty repairs.)

9       116.   Plaintiff was also not aware and could not have been aware that HMA

10 and KMA would willfully not inform him of the Defect which affects the safety of

11 their vehicles and that the Defect could manifest outside of the durational limit of

12 the Warranty, despite Defendants' knowledge of this. *See Carlson v. Gen. Motors*

13 *Corp.*, 883 F.2d 287 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990) (""proof

14 that GM knew of and failed to disclose major, inherent product defects would

15 obviously suggest that its imposition of the challenged 'durational limitations' on

16 implied warranties constituted 'overreaching,' and that the disclaimers themselves

17 were therefore 'unconscionable.'")

## TOLLING OF THE STATUTES OF LIMITATIONS

19      117.   Any applicable statute of limitations has been tolled by Defendants'

20 knowing and active concealment of the Headlight Defect and misrepresentations

21 and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and

22 members of the Class were deceived regarding the Class Vehicles and could not

23 reasonably discover the Defect or Defendants' deception with respect to the Defect.

24 Defendants and its agents continue to deny the existence and extent of the Defect,

25 even when questioned by Plaintiff and members of the Class.

26      118.   Plaintiff and members of the Class did not discover and did not know

27 of any facts that would have caused a reasonable person to suspect that Defendants

28 were concealing a defect and/or the Class Vehicles contained the Headlight Defect

and the corresponding safety risk. As alleged herein, the existence of the Headlight Defect was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendants were concealing the Defect.

119.   At all times, Defendants are and were under a continuous duty to disclose to Plaintiff and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Headlight Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Headlight in Class Vehicles.

120.   Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and members of the Class reasonably relied on Defendants' knowing, active, and affirmative concealment.

121.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

122.   Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

123.   The Class and Sub-Classes are defined as:

**Class**:  All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**California Sub-Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of California.

**CLRA Sub-Class**:  All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

124.    Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Classes should be expanded or otherwise modified.

125.    Numerosity:    Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

126.    Typicality: Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiff, like all Class Members, has been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the defective Headlight and/or its components. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

127.  Commonality:  There are numerous questions of law and fact common to Plaintiff and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)  Whether Class Vehicles suffer from defects relating to the Headlight;

(b)  Whether the defects relating to the Headlight constitute an unreasonable safety risk;

(c)  Whether Defendants knew about the defects pertaining to the Headlight and, if so, how long Defendants have known of the defect;

(d)  Whether the defective nature of the Headlight constitutes a material fact;

(e)  Whether Defendants have had an ongoing duty to disclose the defective nature of the Headlight to Plaintiff and Class Members;

(f)  Whether Plaintiff and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

(g)  Whether Defendants knew or reasonably should have known of the defects pertaining to the Headlight before they sold and leased Class Vehicles to Class Members;

(h)  Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective Headlight and/or its components;

(i)  Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective Headlight and/or its components;

(j)  Whether Defendants breached the implied warranty of

merchantability pursuant to the Magnuson-Moss Warranty Act;

(k)   Whether Defendants breached the implied warranty of merchantability under California law;

(l)   Whether Defendants breached their express warranties under California Law; and

(m)   Whether Defendants breached express warranties pursuant to the Magnuson-Moss Warranty Act.

128.   <u>Adequate Representation</u>:  Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intends to vigorously prosecute this action.

129.   <u>Predominance and Superiority</u>:  Plaintiff and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## **FIRST CAUSE OF ACTION**

### **Violation of California's Consumers Legal Remedies Act ("CLRA"),**

### **Cal Civ. Code § 1750,** *et seq.*

### **(On behalf of the CLRA Sub-Class)**

130.   Plaintiff incorporates by reference each allegation set forth above.

131.   Plaintiff brings this cause of action individually and on behalf of the members of the CLRA Sub-Class.

132.   Defendants are a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

133.   Plaintiff and CLRA Sub-Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

134.   The purchase and leases of Class Vehicles by Plaintiff and the CLRA Sub-Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

135.   The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code § 1761(a) and (b).

136.   Plaintiff and the CLRA Sub-Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

137.   Defendants' representations, active concealments, omissions, and failures to disclose regarding the Class Vehicles violated the CLRA in the following ways:

138.   Defendants misrepresented the Class Vehicles had characteristics, uses, or benefits Class Vehicles did not in fact have (Cal. Civ. Code § 1770(a)(5));

139.   Defendants misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

140.   Defendants advertised the Class Vehicles with the intent not to

1    sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

2        141.   Defendants misrepresented that the Class Vehicles and the warranties

3    conferred or involved rights, remedies, or obligations that they did not (Cal. Civ.

4    Code§ 1770(a)(14)); and

5        142.   Defendants misrepresented that the Class Vehicles were supplied in

6    accordance with previous representations when they were not (Cal. Civ. Code

7    § 1770(a)(16)).

8        143.   Defendants repeatedly engaged in these unfair and deceptive acts or

9    practices in the course of its trade or business. These acts or practices were

10   material, capable of deceiving a substantial portion of the purchasing public, and

11   caused economic harm to purchasers and lessees of the Class Vehicles, including

12   the Plaintiff.

13       144.   By 2019, and well before the sale or lease of Class Vehicles,

14   Defendants knew or should have known about the Headlight Defect affecting the

15   Class Vehicles. Defendants further knew or should have known that the Class

16   vehicles were defectively designed or manufactured, that, as a result of this defect,

17   it was not suitable for its intended use.

18       145.   Defendants had exclusive knowledge of material facts concerning the

19   existence of the Headlight Defect in the Class Vehicles, and actively concealed

20   that defect from consumers. It did so by denying the existence of a defect to

21   consumers—such as Plaintiff—who contacted Defendants about the failures of

22   their Headlights. Defendants also concealed the Headlight Defect by failing to

23   provide an effective and permanent remedy to all of the Class Vehicles.

24       146.   Defendants were under a duty to Plaintiff and the CLRA Sub-Class

25   Members to disclose the defective nature of the Headlights, as well as the

26   associated costs that would have to be repeatedly expended in order to temporarily

27   address the failures caused by the Headlight Defect, because:

28       147.   Defendants were in a superior position to know the true state of facts

about the Headlight Defect in the Class Vehicles;

148.   Plaintiff and the CLRA Sub-Class Members could not reasonably have been expected to learn or discover that the Class Vehicles suffered from the Headlight Defect until, at the earliest, the manifestation of the Headlight Defect; and

149.   Defendants knew that Plaintiff and CLRA Sub-Class Members could not reasonably have been expected to learn or discover the Headlight Defect prior to its manifestation.

150.   In failing to disclose the defective nature of the Class Vehicles, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

151.   The facts concealed or not disclosed by Defendants to Plaintiff and the CLRA Sub-Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the Headlight Defect to be an undesirable quality, as Plaintiff and the CLRA Sub-Class Members did. Had Plaintiff and other Class Members known that the Class Vehicles had the Headlight Defect, they would not have purchased or leased a Class Vehicle or would have paid less for it.

152.   Plaintiff and the CLRA Sub-Class Members are reasonable consumers who did not expect their Class Vehicles to contain defective headlights. It is a reasonable and objective consumer expectation for consumers to expect that the light output from the headlamp assembly is sufficient, does not dim and/or become progressively dimmer over time; that the high beams do not fail to illuminate entirely, that the headlights are not and/or do not become improperly aimed and fail to properly illuminate ahead of the vehicle, and that the headlights are not and/or do not become extremely fogged and unfocused.

153.   As a result of Defendants' misconduct, Plaintiff and CLRA Sub-Class

Members have been harmed in that the Class Vehicles contain defective headlights and do not seal out moisture and humidity to a sufficient degree and/or contain defective seals which allow moisture and condensation to intrude on the headlight assembly. As a result, the light output from the headlamp assembly is dim and/or becomes progressively dimmer over time; the high beams fail to illuminate entirely (often without warning), the headlights are and/or become improperly aimed and fail to properly illuminate ahead of the vehicle, and the headlights are and/or become extremely fogged and unfocused—all of which create a grave risk of serious injury to person and property and cause Class Members to spend money to attempt to remedy the Headlight Defect.

154.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the CLRA Sub-Class Members have suffered and will continue to suffer harm in that they have a Vehicle with defective headlights and they have experienced and may continue to experience their Class Vehicles' light output from the headlamp assembly is dim and/or becomes progressively dimmer over time; the high beams fail to illuminate entirely (often without warning), the headlights are and/or become improperly aimed and fail to properly illuminate ahead of the vehicle, and the headlights are and/or become extremely fogged and unfocused, for which Defendants have refused to provide and effective and permanent fix.

155.   Plaintiff and the CLRA Sub-Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

156.   In accordance with section 1782(a) of the CLRA, Plaintiff's counsel has served Defendants with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiff and the CLRA Sub-Class Members and demanded that Defendants, within thirty (30) days of such

notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs. If Defendants fail to provide appropriate relief for its violations of the CLRA within 30 days, Plaintiff will seek monetary, compensatory, and punitive damages, in addition to the injunctive and equitable relief Plaintiff seeks now.

**SECOND CAUSE OF ACTION**

**Violation of California's Unfair Competition Law,**

**Cal. Bus. & Prof. Code § 17200, *et seq.***

**(On behalf of the California Sub-Class)**

157.   Plaintiff incorporates by reference each allegation set forth above.

158.   Plaintiff brings this cause of action individually and on behalf of the members of the California Sub-Class.

159.   California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." Defendants engaged in conduct that violated each of this statute's three prongs.

160.   Defendants committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by systematically breaching its warranty obligations and by violating the CLRA and the Song-Bervely Consumer Warranty Act as alleged above and below.

161.   Defendants committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, because the acts and practices described herein, including but not limited to Defendants' failure to provide a permanent remedy to fix the Headlight Defect, where immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members. Defendants' acts and practices were additionally unfair because the harm to Plaintiff and Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, Defendants' acts

and practices were unfair in that they were contrary to legislatively declared or public policy.

162. Defendants committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it concealed the existence and nature of the Headlight Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were high quality and functional when, in fact, the Headlight Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. Defendants' representations, omissions, and active concealments about the Headlight Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

163. Defendants' unfair or deceptive acts or practices occurred repeatedly in the course of Defendants' trade or business, and were likely to mislead a substantial portion of the purchasing public.

164. Plaintiff relied on Defendants' material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had he known the truth.

165. As a direct and proximate result of Defendants' unfair, unlawful, and deceptive practices, Plaintiff has lost money.

166. Plaintiff would consider purchasing or leasing similar Defendants' vehicles in the future if Plaintiff could rely on Defendants' representations regarding the vehicles.

167. Plaintiff and Class Members seek an order enjoining Defendants' from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

1

**THIRD CAUSE OF ACTION**

2

**California Breach of Express Warranty**

3

**(On behalf of the California Sub-Class)**

4
168.   Plaintiff incorporates by reference each allegation set forth above.

5
169.   Plaintiff brings this cause of action individually and on behalf of

6
California Class Members.

7
170.   Defendants provided all purchasers and lessees of the Class Vehicles

8
with the express warranty described herein, which became a material part of the

9
bargain.

10
171.   Defendants' provided all purchasers and lessees of Hyundai or

11
Hyundai-branded Class Vehicles with the Hyundai Warranty and all purchasers

12
and lessees of Kia or Kia-branded Class Vehicles with the Kia Warranty.

13
172.   Kia sold and leased the Class Vehicles with a written express

14
warranty covering the Vehicles for six years or 60,000 miles, whichever comes

15
first.

16
173.   Hyundai sold and leased the Class Vehicles with a written express

17
warranty covering the Vehicles for five years or 60,000 miles, whichever comes

18
first.

19
174.   Both the Hyundai Warranty and the Kia Warranty purport to cover

20
the headlights.

21
175.   Defendants manufactured and/or installed the headlights and the

22
headlights' component parts in the Class Vehicles, and the headlights and their

23
component parts are covered by the express Warranties.

24
176.   The Headlight Defect at issue in this litigation was present at the time

25
the Class Vehicles were sold or leased to Plaintiff and the California Sub-Class

26
Members.

27
177.   As described herein, the Class Vehicles were manufactured with

28
defective material and such defect existed at the time the Vehicles left the

manufacturing plant. Plaintiff and Class Members submitted their Vehicles for warranty repairs as referenced herein. Defendants failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the subject materials defect under the Vehicle's warranty as described herein.

178.   Plaintiff and the California Sub-Class Members relied on Defendants' express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

179.   Under the express Warranties, Defendants were obligated to correct the Headlight Defect in the vehicles owned or leased by Plaintiff and the California Sub-Class Members.

180.   Although Defendants was obligated to correct the Headlight Defect, none of the attempted fixes to the headlights are adequate under the terms of the Warranties, as they did not cure the defect.

181.   Defendants breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Defendants falsely informed California Sub-Class Members that there was no problem with their Class Vehicles and/or replaced defective components in the headlight/headlight assemblies with equally defective components, without actually repairing the Class Vehicles.

182.   Defendants and their agent dealers have failed and refused to conform the headlights to the express Warranties. Defendants' conduct, as discussed throughout this Complaint, has voided any attempt on their part to disclaim liability for its actions.

183.   Moreover, Defendants' attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing

1    consumers about the defect.

2         184.   The time limits contained in Defendants' warranty periods were also

3    unconscionable and inadequate to protect Plaintiff and the California Sub-Class

4    Members. Among other things, Plaintiff and the California Sub-Class Members

5    had no meaningful choice in determining these time limitations, the terms of which

6    unreasonably favored Defendants. A gross disparity in bargaining power existed

7    between Defendants and the Class members, and Defendants knew or should have

8    known that the Class Vehicles were defective at the time of sale.

9         185.   Plaintiff and the California Sub-Class Members have complied with

10   all obligations under the Warranties, or otherwise have been excused from

11   performance of said obligations as a result of Defendants' conduct described

12   herein.

13        186.   Plaintiff and the California Sub-Class Members were not required to

14   notify Defendants of the breach because affording Defendants a reasonable

15   opportunity to cure their breach of written warranty would have been futile.

16   Defendants was also on notice of the Headlight Defect from the complaints and

17   service requests it received from Plaintiff and the Class Members, from repairs

18   and/or replacements of the headlights or components thereof, and through other

19   internal and external sources.

20        187.   Because Defendants, through their conduct and exemplified by their

21   own service bulletins, have covered repairs of the Headlight Defect if Defendants

22   determine the repairs are appropriately covered under the Warranties, Defendants

23   cannot now deny that the Warranties cover the Headlight Defect.

24        188.   Because Defendants have not been able remedy the Headlight Defect,

25   any limitation on remedies included in the Warranties causes the Warranties to fail

26   their essential purposes, rendering them null and void.

27        189.   As a direct and proximate cause of Defendants' breach, Plaintiff and

28   the California Sub-Class Members suffered damages and continue to suffer

1   damages, including economic damages at the point of sale or lease and diminution

2   of value of their Class Vehicles. Additionally, Plaintiff and the California Sub-

3   Class Members have incurred or will incur economic damages at the point of repair

4   in the form of the cost of repair.

5       190.   As a direct and proximate result of Defendants' breach of express

6   warranties, Plaintiff and the California Sub-Class Members have been damaged in

7   an amount to be determined at trial.

8       191.   Defendants' acts in failing and/or refusing to repair the materials

9   defect during the warranty period so as to bring the Vehicles into conformity with

10  the express warranties, deprived Plaintiff and members of the Class of their rights

11  guaranteed them under the express warranties offered by Defendants.

12      192.   As a direct and proximate result of the willful failure of Defendants

13  to comply with their obligations under the express warranties, Plaintiff and

14  members of the Class have suffered actual and consequential damages. Such

15  damages include, but are not limited to, the cost of repairing the Vehicles, the loss

16  of the use and enjoyment of the subject Vehicle, and a diminution in the value of

17  the Vehicle containing the materials defects identified herein. The precise amount

18  of these damages is unknown at the present time but is in excess of the

19  jurisdictional limits of this Court.

20                      **FOURTH CAUSE OF ACTION**

21                      **Breach of Implied Warranty**

22          **Under the Song-Beverly Consumer Warranty Act**

23                  **Cal. Civ. Code §§ 1790, *et seq.***

24              **(On behalf of the California Sub-Class)**

25      193.   Plaintiff incorporates by reference each allegation set forth above.

26      194.   Plaintiff brings this cause of action individually and on behalf of

27  California Class Members.

28      195.   Defendants' Class Vehicles are "consumer goods" within the

1    meaning of Cal. Civ. Code § 1791(a).

2    196.   Defendants are manufacturers within the meaning of Cal. Civ.
3    Code § 1791(j).

4    197.   Plaintiff and Class Members who purchased or leased their Class
5    Vehicles within the State of California are "buyers" and "lessees" within the
6    meaning of Cal. Civ. Code §§ 1791(b) and (h).

7    198.   Defendants impliedly warranted to Plaintiff and Class Members that
8    their Vehicles were "merchantable" within the meaning of Cal. Civ. Code
9    §§ 1791(a) and 1792.

10   199.   Defendants impliedly warranted to Plaintiff and Class Members that
11   they would repair or replace any defective products, including the headlights.

12   200.   The propensity of the Headlight Defect to not seal out moisture and
13   humidity to a sufficient degree and/or contain defective seals which allow
14   moisture and condensation to intrude on the headlight assembly, causing the light
15   output from the headlamp assembly to be dim and/or become progressively
16   dimmer over time; the high beams to fail to illuminate entirely (often without
17   warning), the headlights to become improperly aimed and fail to properly
18   illuminate ahead of the vehicle, and the headlights to become extremely fogged
19   and un-focus renders the Class Vehicles to not be of the quality that a buyer or
20   lessee would reasonably expect, and therefore not merchantable.

21   201.   The Headlight Defect is latent and was present at the time of the
22   sale/lease of Class Vehicles, and therefore the Vehicles were not merchantable at
23   the time of sale/lease.

24   202.   The Class Vehicles do not conform to the promises and affirmations
25   of fact made by Defendants in their promotional materials and vehicle owner
26   manuals in that the Headlight Defect creates a safety hazard contrary to
27   Defendants' assurances.

28   203.   In violation of Cal. Civ. Code § 1791(a), Defendants breached their

implied warranty by selling/leasing defective Class Vehicles and refusing to permanently replace and/or repair the defective rear subframes.

204. The Headlight Defect has deprived Plaintiff and Class Members of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

205. Any attempt by Defendants to limit or disclaim the implied warranties in a manner that would exclude coverage of the Headlight Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

206. As a result of Defendants' breach of its implied warranties, Plaintiff and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

## **FIFTH CAUSE OF ACTION**

### **California Breach of Implied Warranty**

### **(On behalf of the California Sub-Class)**

207. Plaintiff incorporates by reference each allegation set forth above.

208. Plaintiff brings this cause of action individually and on behalf of California Class Members.

209. The Class Vehicles are and were at all relevant times "goods" within the meaning of, *inter alia*, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

210. Defendants are and were at all relevant times a "merchant" with respect to the Class Vehicles, under, *inter alia*, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant time a "lessor" of the Class Vehicles, under, *inter alia*, Cal. Com. Code § 10103(a)(16).

211. Plaintiff and Class Members are "buyers" or "lessees" within the meaning of, *inter alia*, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

212.   When they sold or leased their Class Vehicles, Defendants extended an implied warranty to Class Members that the Class Vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

213.   Because Plaintiff and the California Sub-Class Members purchased their vehicles from authorized Hyundai or Kia dealerships, they are in privity with Defendants. Plaintiff and the California Sub-Class Members have had sufficient direct dealings with Defendants and their agents for the purposes of fulfilling their responsibilities under the express warranty (dealerships and customer support personnel) to establish privity of contract between Defendants, on one hand, and Plaintiff and the California Sub-Class Members, on the other hand. Furthermore, Defendants provided warranties directly to Plaintiff and the California Sub-Class Members, and Plaintiff and the California Sub-Class Members are the intended beneficiaries of Defendants' express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

214.   Nonetheless, privity is not required here because Plaintiff and the California Sub-Class Members are the intended third-party beneficiaries of contracts between Defendants and their dealerships. These contracts give the dealerships the right to sell Defendants' branded vehicles, as well as service and perform warranty repairs on Defendants' behalf. Plaintiff and the California Sub-Class Members are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Defendants distributes to its authorized dealerships. Plaintiff and the California Sub-Class Members also have the right to receive service and warranty work at dealerships located more conveniently to them than Defendants' headquarters.

215.   Plaintiff and other Class Members who purchased or leased a Class

CLASS ACTION COMPLAINT

Vehicle directly from Defendants are entitled to the benefit of their bargain: a Vehicle with non-defective headlights.

216.   Defendants breached this implied warranty in that their Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

217.   The Headlight Defect is latent and was present at the time of the sale/lease, and therefore the Vehicles were not merchantable at the time of the sale/lease.

218.   Had the Headlight Defect that existed at the time of sale/lease been known, the Class Vehicles would not have been sold or leased or would not have been sold or leased at the same price for which Class Members paid.

219.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial.

<u>**SIXTH CAUSE OF ACTION**</u>

**(Breach of Express Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq*.)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)**

220.   Plaintiff incorporates by reference each allegation set forth above.

221.   Plaintiff brings this cause of action on behalf of himself and on behalf of the Class against Defendants.

222.   Defendants provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain.

223.   The Headlight assembly and its component parts were manufactured and/or installed in the Class Vehicles by Defendants and are covered by the express warranty.

224.   In a section entitled "New Vehicle Limited Warranty," Kia's express

warranty provides, in relevant part, that Kia "warrants that it will arrange for an Authorized Kia dealer at locations of its choice to provide for the repair of your vehicle if it fails to function properly during normal use." The warranty further provides that "Authorized service facilities will remedy such failures to function properly at Kia's expense[.]" (Kia Warranty).

225. In a section entitled "New Vehicle Limited Warranty," Hyundai's express warranty provides, in relevant part, that Hyundai covers "repair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama, Kia Manufacturing Mexico, Kia Motors Manufacturing Georgia or Hyundai Motor America that is found to be defective in material or workmanship, under normal use and maintenance[.]" The warranty further provides that "Warranty service will be provided by an authorized Hyundai dealership without charge for parts or labor." (Hyundai Warranty).

226. Defendants breached the express warranties by selling and leasing Class Vehicles with Headlights that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the Headlight and its component parts. Defendants have failed to "repair" the defects as alleged herein.

227. Plaintiff was not required to notify Defendants of the breach or was not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants were also on notice of the defect from complaints and service requests they received from Class Members, from repairs and/or replacements of the Headlight, and from other internal sources.

228. Plaintiff also provided notice to Defendants of their breach of warranty claims under the MMWA by letter dated March 15, 2024.

229. As a direct and proximate cause of Defendants' breach, Plaintiff and

the other Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

230. Plaintiff and the other Class members are entitled to legal and equitable relief against Defendants, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## SEVENTH CAUSE OF ACTION

**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 *et seq*.)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)**

231. Plaintiff incorporates by reference each allegation set forth above.

232. Plaintiff brings this cause of action on behalf of himself and the Class against Defendants.

233. The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

234. Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

235. Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

236. Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Headlights manufactured, supplied, distributed, and/or sold by Defendants would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their Headlights would be fit for their intended use while the Class Vehicles were being operated.

237.    Contrary to the applicable implied warranties, the Class Vehicles and their Headlights at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design and materials of their Headlights.

238.    Defendants' breach of implied warranties has deprived Plaintiff and Class members of the benefit of their bargain.

239.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

240.    Defendants have been afforded a reasonable opportunity to cure their breach, including when Plaintiff and Class members brought their vehicles in for diagnoses and Headlight repair.

241.    As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiff and Class members sustained and incurred damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiff and Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

242.    As a result of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff and Class members have incurred damages.

243.    Plaintiff also provided notice to Defendants of its breach of warranty claims under the MMWA by letter dated March 15, 2024.

**EIGHTH  CAUSE OF ACTION**

**(For Fraud by Omission or Fraudulent Concealment)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)**

244.    Plaintiff incorporates by reference each allegation set forth above.

245.    Plaintiff brings this cause of action on behalf of himself and the Class or, alternatively, on behalf of all Sub-Classes against Defendants.

246.    Defendants knew that the Class Vehicles suffered from an inherent Headlight Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

247.    Defendants concealed from and failed to disclose to Plaintiff and Class Members the defective nature of the Class Vehicles.

248.    Defendants were under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles because:

      a. Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

      b. The omitted facts were material because they directly impact the safety of the Class Vehicles;

      c. Defendants knew the omitted facts regarding the Headlight Defect were not known to or reasonably discoverable by Plaintiff and Class Members;

      d. Defendants made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

      e. Defendants actively concealed the defective nature of the Class Vehicles from Plaintiff and Class Members.

249.    The facts concealed or not disclosed by Defendants to Plaintiff and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease

Defendants' Class Vehicles or pay a lesser price for them. Whether a vehicle's Headlight is defective, which can suddenly cause lights to fail, dim, or malfunction during night driving or inclement weather, thereby causing the inability to see pedestrians, animals, and road hazards, is a material safety concern. Had Plaintiff and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

250.    Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiff and Class Members to act thereon. Plaintiff and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff and Class Members' purchase or lease of Defendants' defective Class Vehicles.

251.    Defendants continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

252.    As a direct and proximate result of Defendants' misconduct, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Plaintiff and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

253.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## NINTH CAUSE OF ACTION

### (For Unjust Enrichment)

### (On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)

254.   Plaintiff incorporates by reference each allegation set forth above.

255.   Plaintiff brings this cause of action on behalf of himself and the Class or, alternatively, on behalf of all Sub-Classes against Defendants.

256.   Defendants have received and retained a benefit from Plaintiff and the members of the Class, and inequity has resulted.

257.   As a direct and proximate result of Defendants' failure to disclose known defects, Defendants have profited through the sale and lease of the Class Vehicles, the value of which was artificially inflated by Defendants' concealment of and omissions regarding the Headlight Defect. Defendants charged higher prices for the vehicles than the vehicles' true value, and Plaintiff and Class Members thus overpaid for the Class Vehicles. Although these vehicles are purchased through Defendants' authorized dealers and distributors, the money from the vehicle sales flows directly back to Defendants.

258.   Additionally, as a direct and proximate result of Defendants' failure to disclose known defects in the Class Vehicles, Plaintiff and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendants.

259.   Defendants have been unjustly enriched due to the known defects in the Class Vehicles through the use of money paid that earned interest or otherwise added to Defendants' profits when said money should have remained with Plaintiff and Class Members.

260.   Plaintiff and Class Members were not aware of the true facts regarding the Defect in the Class Vehicles and did not benefit from Defendants' unjust conduct.

261. As a result of the Defendants' unjust enrichment, Plaintiff and Class Members have suffered damages.

262. Plaintiff does not seek restitution under his unjust enrichment claim. Rather, Plaintiff and Class Members seek non-restitutionary disgorgement of the financial profits that Defendants obtained as a result of its unjust conduct.

263. Additionally, Plaintiff seeks injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendant identifies. Plaintiff also seeks injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendants from selling the Class Vehicles with the misleading information; compelling Defendants to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## RELIEF REQUESTED

264. Plaintiff, on behalf of himself and all others similarly situated, requests the Court enter judgment against Defendants, as follows:

        (a) An order certifying the proposed Class and Sub-Classes, designating Plaintiff as the named representative of the Class, and designating the undersigned as Class Counsel;

        (b) A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Headlight, including the need for periodic maintenance;

        (c) An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for

the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to repair and eliminate the Headlight Defect from every Class Vehicle; enjoining Defendants from selling the Class Vehicles with the misleading information; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d) An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial, except that Plaintiff is not praying for an award of monetary damages under the CLRA at this time;

(e) Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f) A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles or make full restitution to Plaintiff and Class Members;

(g) An award of attorneys' fees and costs, as allowed by law;

(h) An award of pre-judgment and post-judgment interest, as provided by law;

(i) Leave to amend the Complaint to conform to the evidence produced at trial; and

(j) Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

265. Pursuant to Federal Rule of Civil Procedure 38(b) and Central District of California Local Rule 38-1, Plaintiff hereby demands a trial by jury of all issues in this action so triable.

1  Dated:  March 29, 2024                    Respectfully submitted,

2                                            **Capstone Law APC**

3

4                                            By: /s/ Tarek H. Zohdy
5                                                Tarek H. Zohdy
                                                 Cody R. Padgett
6                                                Laura E. Goolsby
                                                 Nathan N. Kiyam
7
                                                 **BERGER MONTAGUE PC**
8                                                Russell D. Paul
                                                 (*pro hac vice forthcoming*)
9                                                Amey J. Park
                                                 (*pro hac vice forthcoming*)
10                                               Abigail J. Gertner
                                                 (*pro hac vice forthcoming*)
11                                               1818 Market Street
                                                 Suite 3600
12                                               Philadelphia, PA 19103
                                                 Tel: (215) 875-3000
13                                               Fax: (215) 875-4604
                                                 rpaul@bm.net
14                                               apark@bm.net
                                                 agertner@bm.net
15
                                                 Attorneys for Plaintiff
16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT